**L.** Wethered **BARROLL,** Trustee ulw&t
John **L.** Wethered,

v.

**UNITED STATES** of America.

Civ. No. 7084.

United States District Court
D. Maryland, Civil Division.

Oct. 5, 1955.

On Motion for New Trial
Dec. 6, 1955.

442

Lewin Wethered, Baltimore, Md., for plaintiff.

George Cochran Doub, U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

In this action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671–2678, 2680, plaintiff claims that the fall of plaster from the ceilings of his house on Turner's Creek, in Kent County, on the Eastern Shore of Maryland, during the years 1952 and 1953, was caused by the firing of cannon during testing operations at the Aberdeen Proving Ground, some 8 miles away across the upper reaches of the Chesapeake Bay. The government contends that the fall of the plaster was not caused by any "negligent or wrongful act or omission" on the part of any employee of the government; that the Tort Claims Act does not permit recovery under any theory of absolute liability or liability without fault; and that even if there were any negligent or wrongful act or omission, it would come within the "discretionary function or duty" exception contained in section 2680(a).

### Findings of Fact

The Ordnance Corps operates the Aberdeen Proving Ground (Aberdeen), where it tests all weapons and munitions for the Army, except long range rockets, guided missiles, proximity fuses and fissionable materials.

Aberdeen was established in 1917 pursuant to an act of Congress, 40 Stat. 345, and two presidential proclamations, 40 Stat. 1707 and 40 Stat. 1731. It is located in Harford County, Maryland, on a peninsula of the Western Shore, in the upper reaches of the Chesapeake Bay. A firing range, about 7 miles wide, extends south southwest for a distance of about 15 miles from the firing positions, which are located about 4 miles southeast of the town of Aberdeen. The firing range embraces water, islands, and a part of the western shore of the bay. The impact area for bombs and shells, which is also the area for high explosive

airbursts, is about 9 miles south south-west of the firing positions, and about 4 miles west of the northwest point of Kent County, on the Eastern Shore, known as Howell's Point.

Plaintiff's house is on a high bluff on the west bank of Turner's Creek, half a mile south of the Sassafras River, in Kent County; it is 8¾ miles southeast of the firing position at Aberdeen, and 13½ miles east of the impact and air-burst area.

The Ordnance Corps does research and development work for the Army, and a certain amount of such work for the Navy and the Air Force. The using service describes the performance char-acteristics, technically termed military characteristics, of the item it wishes de-veloped, and the Assistant Chief of Ord-nance for Research and Development de-vises ways and means of developing something to meet those characteristics. He has a staff of about 250 people in Washington engaged in laying out the broad planning for all the research and development establishments. A group of specialists called the Design of Experi-ment Group lays out the test programs, and uses statistical techniques to calcu-late how various items should be treat-ed, to minimize cost and risk and to pro-duce the best results. This Group works in conjunction with the professional en-gineers and other specialists in the par-ticular field involved who will judge the test results. The approval of the Design of Experiment Group sends a test pro-gram to the Proving Grounds. If the staff at the Proving Grounds, which al-so includes experts, finds flaws in the plan, it can appeal to the Assistant Chief of Ordnance for Research and Develop-ment, whose decision is final.

The principal mission of the staff at Aberdeen is to develop and test weapons. It makes most of the engineering devel-opment tests, and also does some ac-ceptance testing of pilot lots produced by industrial manufacturers before the items go into full production and to in-dustrial proving grounds for routine testing. Other activities at Aberdeen have no bearing on this case.

The staff at Aberdeen, under a Direc-tor of Development and Proof Services, executes the programs. The Director and his staff specify the quantity of ex-plosives to be used, within the limits pre-scribed by the Office of the Chief of Ord-nance, the location in which the tests are to be conducted, and the weather conditions under which the tests are to be made. The Office of the Chief of Ord-nance promulgates general safety regu-lations known as the Ordnance Safety Manual, covering many types of activi-ty and binding on all divisions. Any change in these regulations is immedi-ately put into effect at Aberdeen unless it calls for new construction; regula-tions concerning firing are put into effect immediately. The Aberdeen Proving Ground Safety Regulations, which are is-sued by the Aberdeen staff, deal with specific safety problems, many of which are peculiar to Aberdeen. All testing operations are conducted in accordance with the Ordnance Safety Manual and the Aberdeen Proving Ground Safety Regulations. There is no evidence in this case that there was any deviation from the Manual or the Regulations dur-ing the years in question. No shell has ever fallen or exploded outside the firing range. I find that there was no devia-tion from the Manual, the Regulations, the directives of the Office of Chief of Ordnance, or the directives of the office of the Director of Development and Proof, which caused or contributed to any damage to plaintiff's house. I fur-ther find that no negligence on the part of any employee of the government caus-ed or contributed to any such damages.

An order dated April 7, 1952, from the Office of the Chief of Ordnance, of-fered in evidence as a typical directive, specified certain conditions for testing the 280 mm. gun carriage and related equipment at that time. It provided, in-ter alia: "In connection with the proof firing tests which requires (sic) firings at 0 degrees elevation and 115% maxi-

mum rated pressure, these tests should be conducted only after tests in paragraph 5 below indicate the recoil mechanisms will permit these test conditions. Early proof test at 115% maximum rated pressure should be made with special charge so that service muzzle velocities are not exceeded."

The staff at Aberdeen tests hundreds of different items every year. Before World War II it tested 14- and 16-inch guns for the Coast Artillery; these were high velocity rifles and produced much greater air shock than the 280 mm. cannon, which was under development during 1952 and 1953, the years upon which plaintiff's claim is based. During 1952 and 1953 no shells containing more than 100 pounds of high explosives were used; most of the shells fired were inert; but a sufficient charge was included in some of the shells to cause them to burst in the air, so that visual observations could be made from selected points. During those years, the shock waves from the firing were heavier than the waves from the bursting shells. During World War II, bombs containing 8,000 to 10,000 pounds of high explosives had been tested, as well as the 240 mm. cannon, just smaller than the 280 mm., and one exceptional gun, not described in the evidence, was fired a few times. During the Korean War no comparable charges of high explosive were set off, but the number of items tested at Aberdeen increased substantially.

When a large gun, such as the 280 mm. cannon, is fired, a very severe shock wave follows the projectile into the atmosphere at supersonic velocity. It loses velocity and energy very rapidly, so that "in a matter of feet it is down to a sound wave", traveling through the air at 322 meters a second, subject to variation for wind and temperature, with pressure falling off at a rate proportionate to the square of the distance. By the time it has traveled 5 miles the pressure would be no greater than ordinary wind gusts in March and April. At a distance of 8 miles the sound can be heard, and if a plaster wall is about to fall down anyway, the air wave may trigger it, just as a passing truck or a 10 mile gust of wind would do.

When such a cannon is fired, or when an explosion occurs on or in the ground, vibrations are transmitted as surface waves, traveling through the ground at 1800 meters per second, and as two types of sub-surface waves, which may travel at rates from 2300 to 5000 meters per second. These velocities and the force of the vibrations at different distances depend upon a great number of factors, only a few of which are in evidence in this case. These factors include the amount of energy absorbed by the recoil of the gun, as to which there is no evidence, and the character, location, slope and relationships of the various strata of rock between the firing position and the place under consideration.

Geologically speaking, the Aberdeen Proving Ground is located just southeast of the fall line, which runs along the Pennsylvania railroad tracks in that area. To the northwest of that line, the rocks are crystalline, while to the southeast of the line gravels, sands, clays and other unconsolidated and little-compacted rocks have been deposited over the crystalline strata. The various strata slope S 30° E at a very low angle; this is 30° west of the direct line from the firing position at Aberdeen to plaintiff's house, which is S 60° E. The firing positions at Aberdeen, on the Western Shore, and most of Kent County, on the Eastern Shore, including the site of plaintiff's house, are on a deposit of little-consolidated clay loam carrying gravel layers, scattered boulders and sand, known as the Wicomico formation. This type of rock carries vibrations relatively well. Plaintiff's expert witness, a geologist, testified that under certain conditions a transverse wave can cause vibrations 5 miles from its source which can be felt by one standing on the ground; but that he did not have any experience in testing the effects of the firing of cannon, and that he was unable

to state how severe a vibration might be transmitted from the firing at Aberdeen to plaintiff's house.

The brick portion of plaintiff's house, which was built about 1807, is four stories high, with a central stairwell. Connected to the brick building is a much older 2 story frame house, containing the kitchen and other utility rooms. Both houses are plastered. The walls of the brick house were partially replastered in 1939. No one knows when the ceilings of either building were plastered, but at the beginning of the period in question there was at least one large patch in the plaster on the fourth floor ceiling above the stairwell of the brick building, adjacent to the place where plaster fell in 1951–1953.

The brick house has been occupied very irregularly since 1933, usually over week-ends. It was heated by airtight stoves in the rooms which were occupied from time to time; otherwise and at other times it was unheated. The court may take judicial notice of the fact that the climate on the Eastern Shore, like that of the eastern seaboard generally, is quite humid from time to time. The photographs taken in July, 1953, show that at the points where plaster had fallen from the ceilings, the intervals between the lathes were irregular in a number of places. Some plaster fell from the ceilings of the second, third and fourth floors of the brick building in each of the years 1951–2–3. No plaster has fallen from the first floor ceiling of this building nor from any portion of the wooden building during the last 22 years.

Plaintiff has visited the house frequently during the last 20 years and has heard explosions at Aberdeen during the entire period. He has also felt the house shake just before hearing such explosions, and has sometimes seen a shell burst immediately after feeling the vibration. During the Korean War these explosions and vibrations were more frequent and severe than immediately before the Korean War. Plaintiff noticed that plaster had fallen during nights on which he had heard explosions and felt vibrations, but he never saw any plaster fall.

People living in the vicinity of the Proving Ground have complained of one thing or another for many years. The Office of the Chief of Ordnance and the staff at the Proving Ground are conscious of this and plan the tests in such a way as to minimize any grounds of complaint. During the past 5 years there have been about 30 claims or complaints of one sort or another, originating from points distributed around the Proving Ground at distances from 1 to 20 miles from the airburst area. There was no concentration of claims in any one direction. There are several buildings with large glass windows within 200 yards or so of the firing positions, and none of these windows has ever been broken by the firing. Nor is there any evidence that there has ever been any damage to windows or plaster at any of the houses, barracks or other buildings on the Proving Ground.

I find that during 1952 and 1953 the strongest pressures which were transmitted to the vicinity of plaintiff's house were ground waves from the firing of the 280 mm. cannon, but I do not find that these pressures were sufficient to dislodge plaster that was in good condition.

I find that in 1951 the plaster on the ceilings of the brick house, although apparently in good condition, actually was not, but was in such condition that it was likely to fall at any time; and that the vibrations caused by testing work at Aberdeen during 1951–2–3, including the firing of the 280 mm. cannon, triggered the fall of plaster from the second, third and fourth floor ceilings, some in 1951, and more in 1952 and 1953. Of the plaster which fell during 1951–1953, 90% fell during the 2 year period before suit was filed.

The reasonable cost of replastering those ceilings, including the removal of plaster still in place, is $2,500. Plaintiff filed a claim with the government for that amount. A letter from Lt. Col.

Nichols, Second Army Claims Judge Advocate, in connection with that claim, stated:

"You are informed that this headquarters has the authority to approve or disapprove claims of this type only where the amount claimed does not exceed $1000.00. Accordingly, since your claim is in excess of this jurisdictional limitation, the claim in its present form must necessarily be forwarded to The Judge Advocate General, and, if the claim is found to be of a meritorious nature, may be reported to Congress for its consideration. This precludes the necessity of a claimant instituting private relief legislation.

"If, however, you should agree to accept $1000.00 or less, in full satisfaction and final settlement, this headquarters would be in a position to consider and adjudicate the claim as submitted, administratively. For this purpose you will find inclosed a settlement agreement drawn up in the amount of $1000.00. This settlement agreement should not be construed, in any way, as an admission of liability on the part of the Government, since the sole purpose of the agreement is to bring the claim within the jurisdictional limitation for administrative consideration by this headquarters."

The enclosed paper, a standard form 96, was signed and returned by plaintiff. It stated: "I hereby agree to accept the sum of $1000.00 in full satisfaction and final settlement of my claim against the United States for property damage * * *". After plaintiff's claim was disallowed, he filed this action in this court, claiming $3,500.

## Conclusions of Law

■ Since the Federal Tort Claims Act provides for liability only "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employ- ment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred", 28 U.S.C.A. § 1346(b), it is necessary to consider the Maryland law on the question of liability in similar cases.

In Green v. T. A. Shoemaker & Co., 111 Md. 69, 73 A. 688, 23 L.R.A.,N.S., 667, blasting operations in connection with the construction of a railroad, 200 yards or so from plaintiff's house, not only knocked plastering from the walls and broke most of the windows in the house, but also caused rocks to fall on the house and land, one of which came through the roof and landed on plaintiff's bed. The Court of Appeals said: "Blasting of rocks by the use of gunpowder or other explosives in the vicinity of another's dwelling house is a nuisance, and the person doing the act, or causing it to be done, is liable for all injuries that result therefrom." 111 Md. at page 75, 73 A. at page 690. The Court quoted from Webb's Pollock on Torts, p. 494, as follows: "'The kind of nuisance which is most commonly spoken of by the technical name is the continuous doing of something which interferes with another's health or comfort in the occupation of his property, such as carrying on a noisy or offensive trade.'" 111 Md. at page 76, 73 A. at page 690. The principal part of the opinion, however, was devoted to other questions. See also the old case of Dittman v. Repp, 50 Md. 516, in which it was held that an injunction might issue against a brewery whose machinery not only made a continual loud and deafening noise, but also produced strong vibratory and jarring motions, which shook complainant's house and rendered it unsafe for habitation. The court said: "Such a state of things, if true, clearly amounts to a nuisance, such as will give a right of action at law or a court of equity will restrain."

In the more recent case of Toy v. Atlantic Gulf & Pacific Co., 176 Md. 197, 4 A.2d 757, Judge Parke, speaking for a unanimous court, discussed at length the

Maryland law of negligence, nuisance and liability without fault. He noted, as others have done, that Rylands v. Fletcher, 1866, L.R. 1 Ex. 265, 279, aff'd. 1868, L.R. 3 H.L. 330, might well have been decided on the ground of negligence. Referring to the rule of absolute liability applied in that case, Judge Parke said:

"If carried. to its logical consequences, the rule would impose grievous burdens as incident to the ownership of land, and, therefore, the courts have strictly limited the application of the rule. The basic concept underlying the rule is that a person who elects to keep or bring upon his land something which exposes the adjacent land or its owner or occupant to an added danger should be obliged to prevent its doing damage. So, it follows that if the escape be of oil, gas, electricity, explosives, sewage or water artificially accumulated and stored and damage is done to an adjacent property, the occupier is within the rule. In these instances the occupier was not using the land in the common and natural way, and had artificially produced the potential danger whose presence and continuation may well be attributable to negligence, according to the relative circumstances, rather than to the doctrine of liability without fault." 176 Md. at page 213, 4 A.2d at page 765.

The position taken by Judge Parke is in line with the modern trend of opinion, which criticizes the indiscriminate use of the word "nuisance", and requires an analysis of the principles involved. Restatement of the Law of Torts, sec. 822 et seq., sec. 519 et seq., cf. secs. 165, 166; Prosser on Torts, 2d Ed., secs. 59, 60, 70, 72. These authorities state that an actor is liable for a substantial nontrespassory invasion of another's use and enjoyment of land if the actor's conduct is a legal cause of the invasion, and the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct. See also note in 20 A.L.R.2d 1372 et seq.

It is not clear whether the Maryland law today would place liability for nontrespassory damage to property from blasting or other similar activity on some theory of absolute liability or would require a finding of negligence.

If the Maryland rule is that recovery may be had against an individual or a corporation in such a case on some theory of absolute liability, that rule would not require recovery against the government in this case under the Federal Tort Claims Act. In Dalehite v. U. S., 346 U.S. 15, at pages 44–45, 73 S.Ct. 956, at page 972, 97 L.Ed. 1427, the Supreme Court said:

" * * * Though the findings of specific and general negligence do not support a judgment of government liability, there is yet to be disposed of some slight residue of theory of absolute liability without fault. This is reflected both in the District Court's finding that the FGAN constituted a nuisance, and in the contention of petitioner here. We agree with the six judges of the Court of Appeals, [In re Texas City Disaster Litigation, 5 Cir.] 197 F.2d 771, 776, 781, 786, that the Act does not extend to such situations, though of course well known in tort law generally. It is to be invoked only on a 'negligent or wrongful act or omission' of an employee. Absolute liability, of course, arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that doctrine. But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an 'inherently dangerous commodity'

or property, or of engaging in an 'extrahazardous' activity. United States v. Hull, 1 Cir., 195 F.2d 64, 67.

"Petitioners rely on the word 'wrongful' though as showing that something in addition to negligence is covered. This argument, as we have pointed out, does not override the fact that the Act does require some brand of misfeasance or nonfeasance, and so could not extend to liability without fault; in addition, the legislative history of the word indicates clearly that it was not added to the jurisdictional grant with any overtones of the absolute liability theory."

See also Strangi v. U. S., 5 Cir., 211 F. 2d 305; Goodwill Industries of El Paso v. U. S., 5 Cir., 218 F.2d 270; Danner v. U. S., D.C.W.D.Mo., 114 F.Supp. 477.

 But even though, for damage caused by negligent blasting, the Maryland rule might permit recovery on some theory of absolute liability, a plaintiff could proceed in an action on the case for negligence if he should choose to do so. Of course there would be no reason, in an action in a state court, or in a diversity action in a federal court, for a plaintiff to assume the greater burden if he were not required to do so by the state law. But in a suit under the Federal Tort Claims Act, a plaintiff is required to prove some negligent or wrongful act or omission on the part of the government, even though for similar conduct on the part of an individual or a corporation he could recover on some theory of absolute liability. Dalehite v. U. S., supra. In such an action under the Federal Tort Claims Act the rule of res ipsa loquitur may apply in a proper case, cf. Frenkil v. Johnson, 175 Md. 592, 3 A.2d 479, or plaintiff's proof may require the defendant to go forward with the evidence and show either that something else actually caused the damage or that the defendant had exercised that degree of care, however high, required by the circumstances, cf. Baltimore American Underwriters v. Beckley, 173

Md. 202, 195 A. 550. See also Coastal Tank Lines v. Carroll, 205 Md. 137, 106 A.2d 98, and cases cited therein. Due consideration should be given to the high degree of care required of one who deals with potentially dangerous instrumentalities or engages in ultrahazardous activities. This reasoning reconciles the decision, if not all of the language, in U. S. v. Praylou, 4 Cir., 208 F.2d 291, with Dalehite v. U. S., supra.

To what negligent or wrongful act or omission can the plaintiff in the instant case point? There is no affirmative evidence of negligence on the part of any of the operating personnel at Aberdeen. Nor is there any evidence that anyone was negligent in prescribing the conditions under which the guns were fired. Plaintiff's principal contention seems to be that the fall of the plaster immediately following the firing at Aberdeen makes out a case of res ipsa loquitur, or at least requires the government to go forward with the evidence and show that its employees were free from any negligent or wrongful act or omission in every particular not protected by the discretionary function exception, and that the government has not met that burden in this case. I find, however, that plaintiff's claim must be denied, for a number of reasons.

 In the first place, although I have found that the fall of the plaster was triggered by the firing of the cannon at Aberdeen, I have also found that the plaster was not in good condition, and would have been caused to fall by a slight vibration, such as that caused by a passing truck, or an ordinary gust of wind. The creation of such a slight vibration may occur without negligence on anybody's part. Therefore, proof of the fall of the plaster after the firing of the cannon or after plaintiff felt such a vibration did not make out a case of res ipsa loquitur. It did not even call upon the government to go forward with the evidence.

 But whether or not it was required to do so, the government did offer evidence which convinced me of the

following facts: that the conditions under which the firing occurred were specified either by the Office of· the Chief of Ordnance or by the Director of Development and Proof Services at Aberdeen; that these directives had been followed; that there was no *negligent* act or omission on the part of any operating personnel in carrying out the directives; that there was no *negligent* act or omission on the part of the staff at Aberdeen or in the office of the Chief of Ordnance in prescribing the conditions under which the tests were made; and that everything reasonably possible had been done to prevent damage to persons and property as a result of the tests.

Nor was the fall of the plaster caused by any *wrongful* act or omission on the part of any officer or employee of the government. There is no evidence that the amount of the vibration, whether great or slight, could have been reduced by any reasonable act, or was increased by any unreasonable act or omission, on the part of any officer or employee of the government. In determining whether the various decisions of the government were reasonable or unreasonable, i. e. the decision to develop the cannon in the first place, the decision to test it at Aberdeen, and the decision to test it in certain ways and under certain conditions, the court must weigh the gravity of the risk to the plaintiff against the utility of defendant government's conduct. Prosser on Torts, 2d Ed., sec. 72; Restatement of the Law of Torts, sec. 826 et seq. The utility of defendant's conduct—the development of suitable means to defend the republic—was very great. The gravity of the risk—that a vibration would be created in the ground which might be sufficient to cause plaster, not in good condition, to fall in plaintiff's house—was relatively slight.

Plaintiff does not claim that the government is liable merely because it tested cannon at Aberdeen. The selection of the place where a proving ground should be located is clearly within the exceptions set out in 28 U.S.C.A. § 2680 (a).[1] So are such matters as the size of the cannon, the amount and character of the explosive to be included in the charge, the conditions under which the tests should be made, and the location of the firing positions. These were all fixed by groups of specialists, in the exercise of their discretion, as part of their general duties to develop and test weapons and other munitions, and as part of the plan to develop and test the 280 mm. cannon. The decisions of the staff at Aberdeen, under the Director of Development and Proof Services, as well as the decisions of the staff in the Office of the Chief of Ordnance, under the Assistant Chief of Ordnance for Development and Research, come clearly within the discretionary exception in section 2680(a), as interpreted and applied in the Dalehite case:

> " * * * the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." 346 U.S. at pages 35, 36, 73 S.Ct. at page 968.

In that case it was held that all of the decisions were "responsibly made at a

---

1. " § 2680. Exceptions
 "The provisions of this chapter and section 1346(b) of this title shall not apply to—
 "(a) Any claim based upon an act or omission of an employee of the Government, exercising due ,care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." 346 U.S. at page 42, 73 S.Ct. at page 971. The same may be said of the decisions in this case, which were made in furtherance of the government's program for the development and testing of weapons. See also Goodwill Industries of El Paso v. U. S., 5 Cir., 218 F.2d 270; Dahlstrom v. U. S., D.C.Minn., 129 F.Supp. 772. Cf. Eastern Air Lines v. Union Trust Co., D.C.Cir., 221 F.2d 62, 76.

The government contends that Form 96, signed by plaintiff, and quoted in the last paragraph of the Findings of Fact above, amounted to a reduction of his claim to $1,000, within the meaning of 28 U.S.C.A. § 2675(b), which provides that no action shall be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where based upon newly discovered evidence or upon intervening facts. Plaintiff contends that Form 96 was merely an offer to compromise and settle a claim for less than its actual amount, and was not intended and should not be construed to be a reduction of his claim to $1,000 within the meaning of the statute.

In a letter to plaintiff dated October 1, 1953, Lt. Col. Nichols, the Second Army Claims Judge Advocate, discussed the possibility of settlement and enclosed a settlement agreement (Form 96) in the amount of $1,000. No mention was made in this letter, or in any other correspondence in evidence, of "reducing the claim". These facts distinguish this case from Morgan v. U. S., D.C.S.D.N.Y., 123 F.Supp. 794, Corkle v. U. S., D.C.E.D.S.C., 94 F.Supp. 908, and Carlson v. U. S., D.C.N.D.Ill., 88 F. Supp. 337. I construe Form 96 to be an offer of compromise, which would not limit plaintiff's recovery to $1,000 if he were entitled to recover more than that amount under the evidence.

But for the reasons set out above, plaintiff is not entitled to recover in this case, and judgment must be entered in favor of the defendant. It is so ordered.

## On Motion for a New Trial

In support of a motion for a new trial, plaintiff cites Indian Towing Co., Inc., v. U. S., 76 S.Ct. 122, and Bulloch v. U. S., D.C.Utah, 133 F.Supp. 885, 892, respectively decided and reported since the decision in this case. But the decision in this case is not in conflict with those cases, both of which were decided on motion to dismiss the complaint which alleged operational negligence. In Indian Towing Co. the government conceded that the discretionary function exemption did not apply. It may be noted that in Bulloch Judge Christenson construed U. S. v. Praylou in the same way I construe it. He said:

"The fact that an absolute liability under state law may be imposed against individuals for certain dangerous activities does not relieve the Government from liability under the Tort Claims Act where the negligence thereby required is established. United States v. Praylou (United States v. Walker), 4 Cir., 1953, 208 F.2d 291, certiorari denied 347 U.S. 934, 74 S.Ct. 628, 98 L.Ed. 1085."

Motion denied.