**Harold WEISBERG and Lillian Weisberg**

**v.**

**UNITED STATES of America.**

**Civ. No. 11036.**

United States District Court
D. Maryland.

April 19, 1961.

Joseph D. Tydings, U. S. Atty., and Daniel H. Honemann, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

Plaintiffs have sued the government on two "separate and alternative" causes of action: (a) under the Federal Tort Claims Act[1], for injury and damage to their chickens and their chicken and egg business alleged to have been caused by low flights of helicopters over their farm in 1957 and 1958; and (b) under the Tucker Act[2], on the theory that the low flights were so frequent that they constituted a wrongful taking of plaintiffs' property without just compensation in violation of their rights under the Fifth Amendment. The disputed questions of fact include: whether there were any low flights by government helicopters, when they occurred, what immediate injury or damage they caused, and whether they caused any delayed or continuing injury or damage.

The legal principles controlling this case are stated and discussed in United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; D'Anna v. United States, 4 Cir., 181 F.2d 335; Nunnally v. United States, 4 Cir., 239 F.2d 521; and Barroll v. United States, D.C.D.Md., 135 F.Supp. 441. Those discussions need not be repeated here. The pertinent Maryland statutes are set out in note[3],

Joseph L. Rauh, Jr., and John Silard, Washington, D. C., for plaintiffs.

1. 28 U.S.C.A. §§ 1346, 2671 et seq.

2. 28 U.S.C.A. § 1346(a) (2).

3. Anno.Code of Md., 1957 ed., Art. 1A:
"§ 7. *Ownership of space.*
"The ownership of the space above the lands and waters of this State is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in § 8."
"§ 8. *Lawfulness of flight.*
"Flight in aircraft over the lands and waters of this State is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. * * *"
"§ 9. *Injuries to persons or property; lien for damage.*
"The owner of every aircraft which is operated over the lands or waters of this State is prima facie liable for injuries to persons or property on the land or water beneath, caused by the ascent, descent or flight of the aircraft, or the dropping or falling of any object therefrom, unless the injury is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property injured, or unless at the time of such injury the said aircraft is being used without the consent, express or implied, of the owner. If the aircraft is leased at the time of injury to person

below. If the evidence shows that on one or more occasions injury to plaintiffs' chickens was caused by the flight of the government's helicopters, the government is prima facie liable; in other words, there is a rebuttable presumption that the injury was caused by negligence on its part. And if the flights over plaintiffs' land have been so low and so frequent as to constitute a direct and immediate interference with the then existing use of the land, causing something more than a sharing in the common burden of incidental damages, the flights may amount to a taking under the Fifth Amendment.

U.S. 240 [4], a dual highway, is the principal road leading from Washington, D. C., northerly to Frederick, Md. An old road, the Urbana Pike, runs in the same direction a few miles to the east of U.S. 240 and passes through Hyattstown, in Montgomery County, just south of the Frederick County line, some 15 miles south of Frederick. State route 109 runs west from Hyattstown to U.S. 240.

Plaintiffs' 14 acre farm runs along the south side of route 109. North of that road, opposite plaintiffs' farm, is a hill, the crest of which is some 250 ft. higher than the farm but drops off toward the east (Hyattstown) and toward the west (U.S. 240). The land to the south of the farm is also slightly higher than the farm.

Early in 1957 plaintiffs had a laying flock of 900 hens and pullets to provide eggs for their egg business, a breeding flock of 80 or 90 "pheasant chicken" pullets, with an appropriate number of cocks, to provide the broilers and roasters and the squab size birds they sold for the Christmas trade and throughout the year at the very high price of 90¢ a pound. They also had a small "seed flock" of older "pheasant chickens" and some ducks and geese.

Helicopter units are stationed at Fort Belvoir (Davison U.S. Army Air Field), Quantico, Anacostia Naval Air Station, Andrews Air Force Base and Bolling Air Force Base, all in the vicinity of Washington, D. C. Helicopter flights from those fields to Fort Ritchie, Md., and New Cumberland Depot, Pa. are fairly frequent. Such flights are often routed over the vicinity of Hyattstown to avoid the main airways used by conventional aircraft flying to various destinations from the many fields surrounding the high density air-traffic area of Washington, D. C. There are few civilian helicopters in the Washington area, none so large as the H–21's used by the Army. Since helicopters are visually operated they follow the natural terrain and rely in landmarks. The dominant landmark in the Frederick area is Sugar Loaf mountain, some five miles northwest of plaintiffs' farm.

With safety as the dominant consideration, to avoid collisions with conventional aircraft, applicable regulations require helicopters to fly less than 2,000 ft. above sea level. Pilots are generally instructed not to exceed 1,500 ft. The mean surface altitude of the area south of Frederick is from 300 to 500 ft., so the available range for helicopters is not much more than 1,000 ft.

or property both owner and lessee shall be prima facie liable, and they may be sued jointly, or either or both of them may be sued separately. The presumption of liability on the part of the owner, or the owner and lessee, as the case may be, may be rebutted by proof that the injury was not caused by negligence on the part of such owner or lessee, or of any person operating such aircraft with the permission of the owner or lessee, or of any person maintaining or repairing such aircraft with the permission of the owner or lessee. * * * "

"§ 11. *Jurisdiction over crimes and torts.*

"All crimes, torts and other wrongs committed by or against an airman or passenger while in flight over this State shall be governed by the laws of this State; and the question whether damage occasioned by or to an aircraft while in flight over this State constitutes a tort, crime or other wrong by or against the owner of such aircraft, shall be determined by the laws of this State."

**4.** Also known as Interstate and Defense Highway 70 S.

CAB Regulations provide that the minimum safe altitude for ordinary aircraft over "other than congested areas" is 500 ft. above the surface, except over open water or sparsely populated areas, where they should not be operated closer than 500 ft. to any person, vessel, vehicle or structure. 14 C.F.R. 60.17. Helicopters may be flown at less than the prescribed minimum if such operations are conducted without hazard to persons or property on the surface. Ibid. The applicable regulations of the several armed forces in 1957–58 were substantially the same as the CAB Regulation.

Various commands instructed their pilots from time to time to fly at various minimum altitudes. OPNAVINST 3710.7A, 31 December 1956, Sec. VII, Visual Flight Rules, included the following: "5. *Annoyance to Civilians and Endangering Private Property.* Flights of naval aircraft shall be conducted at all times so that a minimum of annoyance is experienced by persons and activities on the ground. It is not enough for the pilot to be satisfied in his own mind that no person is actually endangered; he must take definite and particular pains to satisfy himself that he is flying in such a manner that no person could reasonably think that he or his property is endangered. The following specific restrictions apply additionally, in view of the particularly unfavorable effect of the terror, extreme annoyance, and damage which can be inflicted. a. Fur and poultry farms are to be avoided. Valuable broods and litters have been lost due to panic engendered by aircraft."

The helicopters at Davison USAAF were instructed to fly at a minimum of 800 ft. during most of the period involved in this case. However, weather conditions developing after a flight has started may require helicopter pilots, in the exercise of due care, to fly much lower.[5]

■ Upon consideration of all the evidence, I find as a fact that flights at altitudes of 800 ft. or more above the surface might startle chickens, as other ordinary and customary noises would do, but would not cause them to panic nor injure them in any way. On the other hand, flights at altitudes less than 800 ft. above the surface, especially if immediately over the chicken houses, might cause panic and resulting injury to some chickens.

For some time before 7 August 1957, the Third Helicopter Company, Davison USAAF, conducted day and night helicopter transition training[6] in the general vicinity of Frederick, using the airport west of that city for landings and takeoffs. There were a number of complaints from residents of the Frederick area about the noise of the helicopters, none of which involved livestock or poultry damage, and in August 1957 the Army discontinued the transition training at Frederick, eliminated non-essential flights, and rerouted many essential flights in order to spread them over a greater area.

The Army Major commanding the Davison USAAF unit in 1957–58 was called as a witness by plaintiffs. He testified that he knew of no low flights over the Hyattstown area during the period in question; none were scheduled, and he knew of no reports by his men of being required to fly low over that area. A considerable number of helicopters flew over the Hyattstown area, including plaintiffs' farm, on Civil Defense Day, 12 July 1957. The Major testified that although the operations on that day are classified, he knows of no military or weather condition which would have required or justified any low flights over plaintiffs' farm.

Since such low flights would violate instructions, if not regulations, unless they were required by weather conditions or other necessity, it is unlikely that they would be reported by the pilots; it is unusually difficult for the government to contradict testimony offered by plaintiffs

---

5. Tactical training missions may also require low flights, but no such missions are involved in this case.

6. The purpose of the training was to aid pilots who had been trained on smaller and lighter helicopters to use the H-21's.

in such a case as this, especially where the plaintiffs have not identified the low flying aircraft and appropriate officers or officials have not been promptly notified. Judges, therefore, must scrutinize the evidence offered to support the claims.

At the trial plaintiffs based their claim primarily on a series of flights on Civil Defense Day, 12 July 1957, which plaintiffs reported promptly to governmental authorities, and flights on five occasions in 1958, of which only the April incident was so reported. Plaintiff Harold Weisberg testified that on each occasion some or all of the chickens panicked, a few were smothered, others were clawed and cut so that they could not be marketed, eggs were broken and in some cases eaten by the chickens, cannibalism developed, the number of blood spots in the eggs increased, egg production fell off permanently, and the entire flock of "pheasant chickens" had to be destroyed.

However, Harold Weisberg was not, in my opinion, a trustworthy witness. He exaggerated repeatedly and on many points. Although he testified that others, including his wife, witnessed the low flights, he called only two witnesses: his lawyer, who testified that he saw one low flight on a Sunday in April 1958, which caused the chickens to panic, and an employee, who saw one such flight, but was not sure of the year. Neither Weisberg nor either of his witnesses was able to recognize the markings on any of the helicopters, with one exception. The lawyer said that he "has visions of seeing" an Army Star on one of the khaki helicopters on the Sunday in April 1958, which he thought was April 20. But other evidence offered by plaintiffs indicated that no Army helicopters were in the area that day. Weisberg noted in a diary almost every helicopter he saw over the area in the summer of 1958; but the diary also contains complaints that his chickens were frightened by the sirens of ambulances and fire engines. He complained of jet planes flying in the area in 1948, and has made a claim (not involved in this action) based upon an alleged sonic boom in 1959.

His testimony with respect to damages was based upon a written estimate which he supplied to his attorney in September 1958, and from which he read on the stand; he testified that he has destroyed all the laying records upon which the estimate was based. He did not produce any records of any kind to support his claim, and when he was shown his income tax returns for the years 1955 to 1959, he said that the total sales of eggs and meat shown thereon were not accurate, but were estimates made by his wife, who was not called as a witness. Those income tax returns show that his egg sales increased in 1957 over 1956 and in 1958 over 1957, with the same number of birds, and that his receipts from the sale of meat also increased in each of those years. The farm operation had resulted in a net loss of $1,152.09 in 1956. There was a net profit of $1,008.19 in 1957 and of $1,339.20 in 1958. The meat sales in 1959 were lower, and a part of the decrease may be due to smaller collections in January 1959 from Christmas sales of fancy birds in 1958, but no records were produced to prove this; the reduced size of the flock of "pheasant chicken" breeders with which he started the year 1958 was a factor, which I find was the result of one or more causes for which the government could not be held responsible.[7]

The evidence supports many inferences which are adverse to the claimed loss. Four of plaintiffs' neighbors to the east, south and west, who also raised chickens, testified that neither they nor their chickens had been disturbed by any low flights in the area during the years in question, except that one of them said that a helicopter flying at about 800 to 1,000 ft. had

---

7. Even the statement that the fancy birds are a cross—$\frac{1}{16}$ pheasant and $\frac{15}{16}$ chicken—is probably not true; the only expert who testified on the point stated that birds produced by crossing a pheasant with a chicken have always been found to be sterile.

caused a slight disturbance among his chickens, like the sudden opening of a door would do.

Plaintiffs have stated that they prefer to rest their case on the Tort Claims Act rather than on the Fifth Amendment. The government, while taking the position that there is no sufficient proof of any low or injurious flights, contends that in any event they were not so frequent as to amount to a taking.

 I find that there was no such frequency or continuity of low flights as would amount to a taking of plaintiffs' land or of an easement thereover. It is more difficult to decide how many injurious flights there were, and how much damage they caused.

Despite the many defects in the proof, I find that there was a low flight of government helicopters over the farm on 12 July 1957 which caused the chickens to panic and produced some injury and damage. I further find, on very uncertain evidence, that on not more than five occasions in 1958 a helicopter flew over the farm at less than 800 ft. I find that on each of those occasions a half dozen chickens of various ages and types were smothered, a somewhat larger number were injured and rendered valueless, many eggs were broken, and on each occasion there was a reduction in the number of usable eggs laid for a few days. But I find that plaintiffs have failed to meet the burden resting upon them to show that there was any additional injury and damage. Such evidence as they offered to prove delayed or continuing injury or damage I find unpersuasive for various reasons, including my observation of the witnesses. Where there was a conflict of opinion between the expert witnesses called by the respective parties, I find the testimony of the government's expert more persuasive.

Since the government has not rebutted the presumption of negligence arising from the injury caused by these low flights, it is liable for the resulting damage which has been proved. No additional liability for trespass or nuisance has been shown.

Plaintiffs' evidence with respect to monetary loss is utterly unsatisfactory. Nevertheless, plaintiffs should not be denied all recovery for that reason; the judge should try to estimate what the true loss was from the credible evidence in the case. I find the loss to have been $750.

### Order

The clerk is instructed to enter judgment for that amount.