FORD MOTOR CO. v. WOLBER.

Circuit Court of Appeals, Seventh Circuit.
April 17, 1929.

No. 4036.

Don Kenneth Jones, of Chicago, Ill., for appellant.

Harold A. Smith, of Chicago, Ill., for appellee.

Before ALSCHULER and ANDERSON, Circuit Judges, and BALTZELL, District Judge.

ALSCHULER, Circuit Judge. The action was against Ford Motor Company, appellant, for injury to appellee through the turning over of a farm tractor of its manufacture while appellee was operating it. The five counts of the declaration respectively charge negligence upon appellant: (1) Negligence in designing the tractor; (2) that the tractor was, to appellant's knowledge, an inherently dangerous instrumentality, and that appellant gave no notice of its dangerous qualities; (3) negligence in the design

of the tractor, appellant knowing of its dangerous character; (4) that the tractor was a dangerous instrumentality and was known to be such by appellant, and no notice of the danger was given to appellant's representative who sold the tractor; (5) negligence in construction and design of the tractor.

The first four counts charged that the tractor would summersault if a sudden or heavy pull was encountered when the tractor was not attached to a load; and the fifth count charged that the tractor would summersault when the gas and power were freely applied. The defense was the general issue.

The court denied appellant's motion for an instructed verdict, and the jury found for appellee in sum of $17,000, and judgment was rendered on the verdict.

The tractor in question was sold by appellant to its dealer, from whom it was purchased by one Schultz, a farmer, whose employee, appellee, was operating it at time of accident.

If there is evidence which tends fairly to support the charge of appellant's negligence, and without contributory negligence chargeable to appellee, we are not at liberty to disturb the judgment, and this inquiry is one of fact rather than of law.

It seems that on the afternoon of the accident, when Schultz showed Wolber how to operate the tractor in the field, he warned him against letting the driving wheels "dig in"—i. e., to revolve without moving the tractor. Wolber says he was drawing a disc harrow hitched to the rear of the tractor and had harrowed most of the field before the accident occurred; and while driving across a depression a wheel of the tractor started to spin, whereupon he stopped the tractor and detached the disc harrow, and while slowly throwing in the clutch to go ahead a short distance the tractor suddenly reared up and tipped over backward, pinning him underneath.

While negligence is charged in the construction as well as in the design of the tractor, the record discloses nothing which tends to indicate any defect in materials or in parts, or in putting them together.

Is anything disclosed tending to indicate negligence in the design or plan of the tractor? Nothing whatever, save only the fact that this tractor did turn over, together with some evidence as to the turning over of another tractor of same make.

It is stated in appellee's brief that this manufacturer had put out 321,000 such tractors before this one. In the spring of 1921 Schultz purchased one of these tractors and operated it upon the same farm with evidently satisfactory results, since in October, 1923, he bought another of the same kind, the one in question, which he thereafter operated.

Schultz was a machinist as well as a farmer. For 12 years he had conducted a repair shop for automobiles, tractors, and farm machinery on his farm, and during the late war he had enlisted and had worked as a mechanic on machinery. While probably he was not a mechanical engineer, he would most likely have understood and known whether any of the parts were defective, and as constant operator as well as mechanic would most likely have known and understood any serious defect in the design and operation of the tractor. He overhauled this tractor from time to time, and kept it in what he considered proper order. In this 4½ years of constant use of these tractors, divided about equally between the first and the second machines, no occurrence took place such as the accident in which appellee was injured. All this is very persuasive that there was no negligence as charged in the design of these tractors.

A witness for appellee testified that in 1920 or 1921, in conversation with a field agent for appellant, he told the latter of an occurrence in the same vicinity whereby one Bates was injured by the overturning of one of these tractors—this in response to the agent's inquiry as to the difficulty of selling these tractors in that vicinity. There was no evidence of what the accident was beyond this story of the accident to Bates, of which the witness did not claim even first-hand knowledge. What was the cause of that tractor's turning over, if indeed it did turn over, does not appear. It may have been under conditions wholly unlike those appearing here. So far as direct evidence is concerned it may never have occurred, and if occurring the circumstances do not appear —nothing to indicate a resemblance to the accident to Wolber.

It goes without saying that at times automobiles turn over, and locomotives, and wagons, and vehicles of all kinds, and that rarely is there indication of negligence in design to account for the occurrence. And so with tractors. Operating as they do over all sorts of surfaces, it would be strange indeed that out of the 300,000 or more put out by this concern it did not appear that occasionally one turned over or sustained some other accident not attributable to negligence in design or defective materials or workmanship. This solitary Bates incident, so remote in time from Wolber's accident, and re-

garding which the evidence is so indefinite, in our judgment did not tend to prove the negligence charged.

Appellee himself was not without experience and knowledge on the subject of tractors. He had been a farmer, but March 1, 1925, he started to work for Schultz in the repair shop, having also worked for him in the previous winter. This particular tractor was there at the time to be overhauled, and he helped overhaul it. He had run it up and down the road and about the barnyard, had driven it to be used on his brother's farm as a stationary engine for sawing wood, but he had never before used it in Schultz's field.

Prior to the accident appellee had read appellant's manual, a copy of which was introduced in evidence by appellee. It contains voluminous and detailed instructions for the care and operation of the tractor. On the first page of the instructions are set forth seven rules under the heading "Important Instructions for Operators." In instruction 4 it is stated: "Do not race the motor or let the clutch in suddenly as this might lift the front end of the Tractor off the ground. Should this happen, release the clutch immediately—this will bring the front wheels back to the ground at once." Both Schultz and appellee were thus aware of the tendency of the front wheels to lift up in certain circumstances, and were told what to do in that case. Schultz, in his own experience, mentioned the tendency of the front wheels to lift up in case the large driving wheels were mired or the power applied suddenly, and that when this would happen he had released the clutch and the difficulty was at once overcome.

Appellee contends that the real danger was in the likelihood of the tractor's turning over backwards, and that of this no mention was made, and that therefore both Schultz and appellee were without notice of such tendency. But if there is no evidence that there was faulty design and construction from which such tendency would follow, no occasion arose to give notice of it, although in our view instruction 4 gave sufficient notice of any such tendency if it was present. This was so held in Foster v. Ford Motor Co., 139 Wash. 341, 246 P. 945, 48 A. L. R. 934.

There is yet another feature which in our view has important bearing upon the question of appellant's negligence. The tractor as it was at the time of the accident was materially changed from the tractor as put out by the manufacturer. When Schultz purchased it he procured a so-called Pierce governor from the dealer who sold the tractor to him and had it placed on the tractor, so that the tractor could be used as a stationary engine to drive machinery. The governor could then be set for different speeds, the maximum being 1,500 revolutions a minute, and the speed as set would be maintained by the governor, without personal attention of an operator.

Instruction No. 2 says: "The proper speed to run the motor is 1000 revolutions per minute. This will give the Tractor the correct working speeds as given in Answer No. 20."

It seems that the governor was retained on the tractor and controlled the speed while it was being used for purposes other than as a stationary engine; and when the tractor was righted shortly after the accident, it was found that the governor had been set to admit of the highest rate of speed.

Change was also made by Schultz in the large traction wheels near the rear of the tractor. Those on this tractor were 11 or 12 inches wide, having, at intervals on the periphery, diagonal blades which cut into the ground to prevent spinning or slipping. A very few days before the accident Wolber assisted Schultz in taking his old tractor wheels and bolting them next to those of this tractor, thus doubling the width of each wheel. It seems that the manufacturer had made provision for widening the traction wheels, if desired, by supplying an additional rim seven inches wide, arranged with blades straight across and at half the intervals of the diagonal blades of the tractor drive wheels. Whatever, if any, reason or advantage there may be in having the additional rim of the width as supplied by the manufacturer and the blades thereon of the stated number and pitch, is not readily apparent to the nonexpert mind; nor what its disadvantage, if any, might be as compared with a duplication of driving wheels by adding others like them.

It is remotely possible that with the latter, if the power were applied, and if with this possible excess of traction the tractor nevertheless did not move forward, there would be increased tendency, on the turning of the shaft, of the forward part of the tractor to lift and even to turn over. If this is so, or through some other reason, explained or unexplained, the unauthorized and unintended duplicating of the traction wheels increased the lifting tendency, and introduced the danger of tipping over backward, it presented a situation for which no responsibility could attach to the manufacturer who did not so design it.

And likewise as to the operation of the governor. While the tractor was being used as a stationary engine the higher speed was evidently entirely permissible, and it was desirable, through the governor, to keep the speed uniform without constant attention of an attendant; but when used as a tractor, speed beyond 1,000 revolutions a minute was not desirable and was warned against; yet, with the governor in place, and set for a maximum of 50 per cent. greater speed than was desirable or recommended for tractor purposes, and with the speed thus controlled by the governor to the maximum at which it was set, the evidence indicated that when the power was applied the speed at once went even beyond the maximum for which the governor was set, for the balls of the governor were thrown apart, and it was not until they revolved for a time that they settled down to the control at which they were set. What the initial speed was beyond the maximum of setting, we cannot know; but is the suggestion unreasonable that the sudden application of power threw the motor into a speed far higher than contemplated and directed, and, with the excessive traction of the driving wheels, tended to introduce the very danger which caused the accident, but which the manufacturer, in the design and construction of the tractor, did not and could not contemplate?

It appears also that shortly before the accident a spring for regulating the governor broke, and Wolber testified that he saw Schultz fix the spring the day before the accident; and it also seems that the wheels from the other tractor were added but a very short time preceding the accident. Schultz testified:

"My experience in starting the tractor up with the governor attached as it was in this case at the time of the accident without a load is that the clutch must be handled carefully in order to start without lifting the front end. You must be especially careful when the engine is going."

"When the governor is in the last notch as I had it without a load the clutch must be handled carefully and engaged carefully or slowly, and I knew that prior to the time of Wolber's accident as to any clutch. I know that with that type of governor when a sudden pull is encountered by engaging the clutch there, that the balls will open up, throw the throttle open and go on past the set revolutions, then work back again."

It nowhere appears that in the use of the tractor for tractor purposes the employment of a governor, or the change in the driving wheels such as was here effected, was contemplated by the manufacturer, and the tractor thus equipped was not the tractor which appellant placed upon the market for use as a tractor.

The contention for appellee that the doctrine res ipsa loquitur here applies is wholly untenable. That the tractor was not the same as that put out by the manufacturer of itself would forbid the application of the rule.

But when it was considered that this very machine was in regular use for over two years without such occurrence, succeeding one like it in possession of same purchaser for about the same period of time, and the similar absence of such manifestation, the reasonable conclusion to be drawn is, not that the occurrence was such that it bespeaks the negligence of the manufacturer in the design or construction of the machine, or in lack of notice of its dangers, but rather that something which was done to the machine after it passed from the manufacturer's custody and control, possibly coupled with circumstances of operation which do not appear in evidence, and which it does not appear the manufacturer could reasonably have anticipated, was responsible for the unfortunate occurrence.

We are satisfied that the record fails to show that appellant was guilty of the negligence charged, and that the judgment is without evidence to support it.

Judgment reversed and cause remanded.