Billy D. MEDLEY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 77–43–S.

United States District Court,
M. D. Alabama, S. D.

June 1, 1979.

Euel A. Screws, Jr., and Robert D. Segall, Montgomery, Ala. (Hobbs, Copeland, Franco & Screws), Montgomery, Ala., and Joe S. Pittman, Enterprise, Ala., for plaintiff.

Barry E. Teague, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M. D. Ala., Montgomery, Ala., for the United States.

## OPINION

FRANK M. JOHNSON, Jr., District Judge.

While assisting with clean-up operations in the aftermath of hurricane Eloise, plaintiff Billy D. Medley was seriously injured. He brings this action pursuant to the Federal Tort Claims Act, charging the United States with negligently causing his injury. 28 U.S.C. §§ 2671–2680. Plaintiff having made presentation of his claim to the appropriate federal agency more than six months prior to his commencement of this suit and no action having been taken, the Court has jurisdiction. 28 U.S.C. §§ 1346(b), 2675.

In October, 1975, hurricane Eloise caused extensive damage in Coffee County, Alabama. Units of the Alabama National Guard were activated to assist in the subsequent clean-up operation. When these units were deactivated, the National Guard agreed with officials of Coffee County to permit the continued use of Guard equipment to complete the operation, provided Guardsmen were paid by the county. It was at this time that a fellow Guardsman, Sgt. Ricky Snellgrove, invited Medley to join the clean-up effort. Medley had not previously been activated and had joined the Guard only the month before. Unable because of the heavy rains to work in his usual job as a brick mason, Medley agreed to work in the clean-up operation.

During his first two days, Medley rode with Sgt. Snellgrove to observe the procedures being followed. The work consisted of loading tree stumps onto the five-ton M–817 dump trucks owned and issued by the United States to the National Guard. Sgt. Snellgrove and Medley testified that the dump truck drivers would occasionally assist in the loading of the stumps in two ways. They would stand on the cab protector of the truck to help direct the crane operator in placing the stumps in the dump body. In addition, it was often necessary for the drivers to climb into the dump body after the stump had been set down in order to unhook the chains. On his third day, Medley began driving one of the M–817 dump trucks. On his fourth day, October 12, 1975, Medley was standing on the cab protector of his truck to assist in loading a stump when the dump body unexpectedly kicked up. Medley fell back onto the cab frame and was crushed when the dump body came down, pinning him against the metal frame of the cab. There is no dispute that the engine was off and that the lever for the hydraulic lift was in the neutral-lock position.

Prior to the accident, Medley and the crane operator, Sgt. O'Ferrell, had had some difficulty loading the stumps so as not to strike the power lines under which the dump truck was driven. At the time of the accident, therefore, O'Ferrell was attempting to load the stump with the roots down and toward the cab. Because the mass of

roots caused the stump to be too high, O'Ferrell attempted to use the arm of the crane to press the stump and roots further down into the dump body. Although O'Ferrell testified that he had already swung the boom away from the truck, the Court finds that it was as he was still using the boom to force down the stump that the dump body rose, then fell, injuring Medley.

The evidence further reflects that, at the time of the accident, the tailgate of the dump truck was in a cocked position. Like many commercial dump trucks, the M–817 has a tailgate that can be hinged both from the top and the bottom. The tailgate is hinged from the top for spreader operations —e. g. to dump sand or gravel evenly. When hinged from the bottom, the tailgate can be let down in a horizontal position supported by chains, thereby lengthening the bed of the truck. Unlike most commercial trucks, however, the M–817 has a third tailgate position. The M–817 gate may be hinged from the bottom and placed in a cocked position, supported by heavy, metal flange panels attached to the dump body. When the tailgate is in the cocked or "rocker" position, large, heavy objects can be dumped over the tailgate without damaging it. Thus commercial dump trucks used in quarries incorporate the "rocker" fixture as an integral part of the dump body itself. Such trucks have no gate.

Plaintiff's case pivots on the tailgate design of the M–817 dump truck. Plaintiff argues that with the tailgate in the cocked position, the length of the dump body is, in effect, extended and the leverage characteristics of the dump body are thereby changed. With the tailgate in the cocked rather than in the closed position, only one-third the weight is necessary to cause the dump body to rise.[1]

Plaintiff contends that, after the stump was placed in the truck, it rolled against the cocked gate. This substantial weight at the point of maximum leverage, plaintiff says, caused the dump bed to kick up unexpect-

edly. Plaintiff's theory is that this sequence was foreseeable by a design engineer with a basic knowledge of physics. Therefore, the United States was negligent in failing to install a mechanical locking device to prevent dumping while the truck is being loaded. It is urged that the United States was also negligent in failing to warn that the M–817 might unexpectedly dump when the gate is in the cocked position. The Court finds, however, that the evidence fails to establish that the United States was negligent in any way. Even if the United States was negligent, plaintiff was guilty of contributory negligence and is barred from recovery.

## I. DISCRETIONARY FUNCTION

█ At the outset, the United States argues that it is immune from suit upon these facts. The Federal Tort Claims Act grants immunity to the United States against "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), the Supreme Court gave that exception a broad reading, stating that "[w]here there is room for policy judgment and decision there is discretion." Arguing that the M–817 represents the implementation of such a policy decision, the United States claims immunity from this action.

*Dalehite* did not, however, immunize all governmental decisions. It distinguished "planning" decisions, which are not actionable, from "operational" decisions, which are. Yet in drawing the distinction, the Supreme Court explained that planning-level decisions include more than the initiation of programs and activities. They include determinations "in establishing plans, specifications or schedules of operations" and even reach "th[e] acts of subordinates in carrying out the operations of government in accordance with official directions." *Id.* The Su-

---

1. With the gate extended to the fully horizontal position, of course, the leverage is even greater. But the evidence suggests that because the gate, in that position, is supported only by chains (like those on a pick-up), it would snap before it would cause the dump body to rise.

preme Court clearly intended the exception to cover more than the largest and most comprehensive planning decisions. But to read "plans, specifications or schedules of operations" as expansively as does defendant is to all but erase the distinction between planning and operational choices. As the Fifth Circuit cautioned in *Smith v. United States*, 375 F.2d 243, 246 (1967):

> Most conscious acts of any person whether he works for the government or not, involve choice. Unless government officials . . . make their choices by flipping coins, their acts involve discretion in making decisions.

> If the Tort Claims Act is to have the corpuscular vitality to cover anything more than automobile accidents in which government officials were driving, the federal courts must reject an absolutist interpretation of *Dalehite*, and that interpretation is rejected by *Indian Towing* [*Indian Towing Co. v. United States*] [350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)] and especially by *Rayonier* [*Rayonier, Inc. v. United States*] [352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957)].

The danger to be avoided by the courts is an application of the planning-operational standard without reference to its underlying rationale and that of Section 2680(a).

The exception carved out by Section 2680(a) safeguards the separation of powers. It serves to prohibit judicial interference with decision-making properly exercised by the other branches of government and thereby protects "the Government from liability that would seriously handicap efficient government operation." *United States v. Muniz*, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963). Appreciating this rationale, the Supreme Court in *Dalehite* contrasted the discretion of an executive to act according to his best judgment on matters of policy with judgments made "within the limits of positive rules of law subject to judicial review." 346 U.S., at 34, 73 S.Ct., at 967. These rules are absent "when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply fur-

nishes an inadequate crucible for testing the merits of social, political, or economic decisions." *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D.Pa.1978). Some areas of governmental activity, by their nature, involve weighing social, political, and economic factors. The courts routinely find that discretion is involved in the promulgation of regulations and the awarding of government contracts. *First National Bank v. United States*, 552 F.2d 370 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977) (regulations); *Miller v. United States*, 522 F.2d 386 (6th Cir. 1975) (regulations); *Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252 (2d Cir. 1975) (government contracts). The same is true of foreign affairs. Some courts have also placed military judgments in that category. *Huslander v. United States*, 234 F.Supp. 1004 (W.D.N.Y.1964) (sonic boom from supersonic flight); *Barroll v. United States*, 135 F.Supp. 441 (D. Md. 1956) (choice of where to test cannons); *Bartholomae Corp. v. United States*, 135 F.Supp. 651 (S.D. Cal.1955) (nuclear testing), *aff'd on other grounds*, 253 F.2d 716 (9th Cir. 1957). Plaintiff does not question the decision made in the late 1940's to build a tactical series of 5-ton trucks that would include a dump truck. That clearly was a policy decision. Rather, plaintiff questions a detail of the dump truck's design. The matter of the truck's leverage and its lack of a safety lock involved no policy considerations at all.

Setting standards of safety is one thing; adherence to those standards is another. The former involves balancing social wisdom against economic expediency; the latter involves objective standards, which permit judicial scrutiny. As the court said in *Hendry v. United States*, 418 F.2d 774, 782, (2d Cir. 1969), "it is pertinent to inquire whether the complaint attacks on the one hand the nature of rules which a government agency has formulated, or on the other hand the way in which these rules are applied." The court in that case held that withholding a ship officer's license was not protected by the discretionary function ex-

ception where the determination that he was unfit was based on an allegedly negligent psychiatric examination by employees of the United States Public Health Service. *Accord., Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974). The court held, in effect, that medical malpractice is medical malpractice. The fact that federal officers commit it does not immunize the government from tort liability. Similarly here, if the M–817 dump truck was negligently designed, the fact that federal employees designed it does not immunize the government. The United States offered no evidence that a safety lock was omitted as a result of a conscious policy decision. Nor did defendant suggest that the military versatility of the M–817 would be impaired by the addition of a safety lock. Surely no one would contend that, if defendant had negligently designed the steering mechanism on the M–817 such that it would go out of control at speeds over 30 mph, the discretionary function exception would apply. For the same reason, it cannot apply here.

When the courts have closely examined the nature of the decision challenged by a plaintiff, they have often held matters of military design to be operational judgments. On point is *United States v. DeCamp*, 478 F.2d 1188 (9th Cir. 1973). In *DeCamp*, the Army Corps of Engineers decided not to require safety canopies on bulldozers. Subsequently, a tree fell killing a bulldozer operator. The district court found that the lack of a canopy was a proximate cause of the death. Addressing the discretionary function exception, the Ninth Circuit stated that "the decision . . . was not predicated upon considerations of public policy but upon general standards of safety. Accordingly, state tort law can capably measure the reasonableness of the engineer's judgment in applying professional standards of safety." 478 F.2d, at 1192;

see *Swanson v. United States*, 229 F.Supp. 217 (N.D. Cal.1964) (design decisions for tail assembly of military plane not protected by the exception). The Fifth Circuit has made the same distinction in analogous cases. *Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714 (1973) (construction of drainage ditch abutting railroad tracks); *Pigott v. United States*, 451 F.2d 574 (1971) (test of rocket engine).[2] Within the parameters set by military planners, defendant was under a duty to design a safe dump truck. If, as alleged, it failed to do so, that failure reflects a mistake of professional judgment and not an abuse of political discretion. This claim is thus not barred.

## II. *NEGLIGENCE*

The rule of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), that a manufacturer may be liable for negligence to remote users has been long-established in Alabama. *Crane Co. v. Davies*, 242 Ala. 570, 8 So.2d 196 (1942); *Miles v. Chrysler Corp.*, 238 Ala. 359, 191 So. 245 (1939). A manufacturer may be liable not only for the negligent construction of an item but also for its negligent design. *Norton Co. v. Harrelson*, 278 Ala. 85, 176 So.2d 18 (1965).

Needless to say, the United States was not the manufacturer of the M–817 and its predecessors. It appears that these dump trucks were actually fabricated by American Motors, and before them, by Jeep. This fact does not exempt the United States from potential liability for negligent design. A variation of the Alabama "Manufacturer's Liability Doctrine" applies to non-manufacturing vendors. *Blitzstein v. Ford Motor Co.*, 288 F.2d 738 (5th Cir. 1961); *Sears, Roebuck & Co. v. Morris*, 273 Ala. 218, 136 So.2d 883 (1962). Here the United States supplied M–817 dump trucks to the Alabama National Guard. While it

---

2. Where the United States does not itself design a product, but approves another's design, the act of approval may fall within the discretionary function exception. *Daniel v. United States*, 426 F.2d 281 (5th Cir. 1970) (plans for interstate highway). But in *Moyer v. Martin Marietta Corp.*, 481 F.2d 585 (5th Cir. 1973),

the court determined that the acceptance by the Air Force of a negligently designed ejection seat, which posed a safety hazard to the pilot, did not fall within the exception. The discretion which was immune encompassed only the selection of the type aircraft to be built and the choice of the number to be purchased.

did not retain responsibility for the operation or maintenance of the trucks, it did retain ownership. 32 U.S.C. § 702. Thus although the United States was not, strictly speaking, a manufacturer, neither was the National Guard a remote user.[3] As to military vehicles like the M–817, the United States while being less than a manufacturer is more than a supplier. The evidence is ambiguous as to whether the design of the M–817 originated with the United States or the Heil Corporation. It is clear, however, that since 1953 when the Army added this truck to its inventory, the United States has taken a primary role in the modification and testing of successive models of the truck. Specifically, the United States has redesigned elements of the tailgate assembly four times since 1958. In addition, it is to engineers at the Army Tank Automotive Command that defects are reported. In the first instance, they and not the manufacturers test for these defects and revise the specifications to remedy them. The United States might not be liable for the negligent manufacture of an M–817 truck; but where it undertakes the primary responsibility for design, the United States is under a duty to exercise reasonable care to design a safe product.

▉ Under the old "Manufacturer's Liability Doctrine," liability is predicated upon negligence.[4] The Alabama Supreme Court has held that a manufacturer or designer is liable: (1) where it "has negligently placed on the market a product which is inherently or imminently dangerous to human life or health, or which, although not dangerous in itself, becomes so when applied to its intended use in the usual and customary manner;" (2) where the injury is the proximate result of this negligence; and, (3) where the injury was reasonably foreseeable. *Defore v. Bourjois, Inc.*, 268 Ala. 228, 230–31, 105

So.2d 846, 848 (1958); *Altorfer Bros. Co. v. Green*, 236 Ala. 427, 183 So. 415 (1930); *Sterchi Bros. Stores, Inc. v. Castleberry*, 236 Ala. 349, 182 So. 474 (1938). It has been noted that Alabama courts have freely permitted juries to infer negligence from circumstantial evidence where there is direct evidence of a defect in the product. *Pouncey v. Ford Motor Co.*, 464 F.2d 957, 961 (5th Cir. 1972), *citing, Sears, Roebuck & Co. v. Morris*, 273 Ala. 218, 136 So.2d 883 (1962) (negligent design of wheel). The law is clear, however, that negligence is not proved by the mere existence of a defect or by a showing that the injury would not have occurred had the product been designed differently. The standard of reasonable care does not require that a product be accident-proof; nor does it require that a product incorporate the ultimate in current safety and design. 63 Am.Jur.2d *Products Liability* §§ 62–88; Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product*, 71 Yale L.J. 816 (1962).

▉ Plaintiff seeks to put just such an undue burden on the United States. A straightforward application of the test stated in *Defore*, however, compels a conclusion that the United States did not breach its duty of reasonable care in designing the M–817. Without question, the dump truck here in question was not inherently or imminently dangerous. The courts have reserved that label for such things as gasoline, gunpowder, and poison. *Defore*, 268 Ala., at 231, 105 So.2d 846.[5] At most, the M–817 was dangerous "when applied to its intended use in the usual and customary manner." The evidence, however, fails to support even that limited claim. The fact that the M–817 has been in use for twenty-five years without any report of an accident like this one is persuasive evidence that the

---

**3.** Coffee County was technically the "user" of the equipment at the time of the accident because it was paying the salaries of the operators. The evidence indicates, however, that National Guard personnel operated the equipment throughout the clean-up effort.

**4.** The "Extended Manufacturer's Liability Doctrine," first articulated in *Casrell v. Altec In-*

*dustries, Inc.*, 335 So.2d 128 (Ala.1976), is discussed below.

**5.** All vehicles may be deemed "inherently or imminently dangerous" when they are in motion. But the M–817 was stationary during the loading operation that resulted in plaintiff's injury, and the accident had no connection with the truck's capacity for movement.

truck is not dangerous. One familiar case reflects the weight to be given such evidence where negligence must be inferred largely from the fact of the accident itself. In *Ford Motor Co. v. Wolber*, 32 F.2d 18 (7th Cir. 1929), plaintiff alleged that a tractor was negligently designed that had reared up and tipped over backward, pinning him underneath. In that case, there was some evidence of a similar incident involving another tractor. But for the court, the fact that plaintiff had used the tractor for four and one-half years before the accident was "very persuasive that there was no negligence as charged in the design of these tractors." 32 F.2d, at 19. The court noted that it would be strange indeed if out of the 300,000 or more tractors produced there was not one accident that was not attributable to negligence in design or materials or workmanship. And so here. Moreover, one looks in vain in the evidence for any of the indicia of negligence in design. The United States did not neglect, for instance, to incorporate a locking device found on many or most dump trucks. Indeed plaintiff admits that no dump truck on the road today includes a device to lock the bed to the frame during loading. Second, plaintiff has pointed to no statutes or trade standards requiring or recommending such a device. *DePree v. Nutone, Inc.*, 422 F.2d 534 (6th Cir. 1970); *Wallner v. Kitchens of Sara Lee, Inc.*, 419 F.2d 1028 (7th Cir. 1969).

Third, plaintiff has proffered no proof that defendant has modified the truck's design since the accident. Thus, plaintiff has not even established an implied design standard. *Wells v. Jeep Corp.*, 532 P.2d 595 (Wyo.).

Even were plaintiff's evidence more formidable, it would not establish that the M-817 was dangerous when used in its intended fashion because at the moment of the accident the truck was being misused. The M-817 was designed to carry heavy loads, including objects such as the stumps being cleared by plaintiff and his fellow workers. Were the evidence that the mere setting of the stump in the dump bed caused it to rise, this would be a different case. But drawing the ready inference from Sgt. O'Ferrell's equivocation, the Court finds that the dump bed kicked up when O'Ferrell used the boom of the crane to apply downward force on the stump as it rested in the rear of the dump bed.[6] That the bed rose under this concentrated pressure, mechanically applied, no more reflects inadequate design than would have the breakage of the truck's hydraulic system under those circumstances. What this freak accident reflects is a misuse of both the crane and the dump truck. Beside this explanation, plaintiff's theory that the cocked tailgate position altered the leverage characteristics of the truck is highly specu-

**6.** Summary of Sgt. O'Ferrell's testimony:

On direct examination:

The dump truck was on a slight incline, the front of the truck being higher than the rear. The crane was to the right of the truck. The stump was picked up from behind the truck, was lifted over the tailgate, and was set "straight down" next to the cab protector. O'Ferrell let the block down and it turned loose. The trunk was still standing up high, so O'Ferrell took the boom of the crane and "mashed the stump down." He then took the boom up. The stump sat for a minute, then tilted over. It caught the tailgate and slipped completely out of the truck. The body then flopped up and back very quickly.

In answer to specific questions, O'Ferrell indicated: (a) that the chain came unhooked by itself, (b) that he mashed the stump down, but couldn't get it completely down to the tailgate, (c) that he put the crane in gear and moved the boom 4 5 feet before the stump tilted to the

rear, and (d) that the stump slid when it hit the tailgate and then the body dumped.

On cross-examination:

O'Ferrell referred to the stump "turning over" after he set it in the body but *before* he used the boom to mash it down. After the stump turned over, the roots were in the middle of the dump body. Using the boom to mash down the stump, O'Ferrell could not get the stump to go down all the way, and when he raised the boom the stump was not touching the tailgate. He further testified that he knew the chain had come unhooked only because it was unhooked when he looked at it after the accident.

On re-cross:

O'Ferrell testified that he could only say that sometime between the time when he took the tension off the chain and when the stump was on the ground after the accident the chain came off.

lative. That theory cannot account for why the dump bed on one M–817 unexpectedly rose one time when other identical trucks carrying the same load over the period of more than one week never revealed a similar tendency. O'Ferrell's misuse of the crane and attendant misuse of the dump truck account for that apparent anomaly. In the closely analogous case of *Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 217 S.E.2d 863, 868 (1975), the court concluded, "It was the unforeseeable misuse of the hoist, not the absence of an upper safety hook, that caused the accident." There a worker was injured when a portable hoist became disengaged and fell from the hook supporting it. The worker alleged that the hoist was negligently designed in that the hook supporting it was open-throated, without a safety catch. Such catches had been available as optional items at a cost of only $1.60 for over twenty years. The court found, however, that at the time of the accident the hoist was being used to dislodge "frozen" bundles of metal. The probability was therefore great that the load exceeded the capacity of the hoist and that the hook attached to the load suddenly released, causing a backlash that disengaged the hoist from its supporting hook. "The jury could reasonably have concluded from the evidence," the court said, "that if the hoist had been equipped with an upper safety hook the accident would not have occurred." 217 S.E.2d, at 868. So in the case at bar, the accident would not have occurred had the dump bed been locked to the frame. But such a showing "is not sufficient to impose liability." *Id.* Misuse, involving unusual strain on the product in question, caused both accidents. Thus in this case as in *Turner* there is no evidence from which it can be concluded that the products were unsafe in their ordinary use.

■■■■ Even if (1) Medley and O'Ferrell were using the M–817 in the customary fashion, (2) the design was defective, and (3) the defect was the proximate cause of plaintiff's injury, a finding of negligence does not follow. Negligence must be predicated on proof that the danger created by the challenged design is likely and foreseeable. Such evidence is conspicuously absent. The M–817 is basically the same dump truck used by the Army for the past twenty-five years. Yet neither of defendant's experts from the Tank Automotive Command had ever heard of any incident similar to this one. Nor had plaintiff's expert, who testified about commercial dump trucks, ever heard of a case of unexpected dumping. A history of accident-free use does not immunize a designer from liability; but it is strong evidence that there is no unreasonable risk of harm. 2 *Harper and James* § 2812; 63 Am.Jur.2d *Products Liability* § 88. In *Simmons v. Gibbs Mfg. Co.*, 170 F.Supp. 818 (N.D. Ohio 1959), *aff'd*, 275 F.2d 291 (6th Cir. 1960), the court held the fact that 7,500,000 toy tops had been manufactured over a ten-year period without report of injury was persuasive evidence that the top was properly designed. While the number of M–817 trucks is undoubtedly fewer, they have been produced over a period of time twice as long. It cannot be said with absolute certainty that there have been no incidents of unexpected dumping by M–817 trucks. But the evidence does indicate that there have been no reports of such incidents, if any. There is thus no basis for a conclusion that the design of the M–817 creates an unreasonable risk of harm. Nor is there any basis for this Court to conclude that the alleged danger is foreseeable. "Simple physics" may well disclose the theoretical possibility of a dump when sufficient force is applied to the tailgate of the truck. But plaintiff's and defendant's experts alike, from their long and practical experience with dump trucks, clearly believed, until this freak accident, that an unexpected dump was impossible. Their judgment was grounded not solely on their experience, but also on the assumption that the hydraulic lift system would offer sufficient resistance to prevent the truck from dumping. That assumption may be wrong, but it is not unreasonable. The designers of the M–817 cannot therefore be fairly charged with negligence for failing to have foreseen this kind of accident.

Furthermore, there is no evidence that any dump truck, commercial or military, has the kind of mechanical locking device that plaintiff contends is necessary to insulate the defendant from a charge of negligent design. Compliance with industry standards is not conclusive; but again it is an important indication of freedom from negligence. 63 Am.Jur.2d *Products Liability* § 79; Noel, *Manufacturer's Negligence, supra* at 848–852. The Supreme Court of Virginia relied upon such evidence in *Turner*, as did the court in *Simmons v. Gibbs Mfg. Co.* The inference in favor of defendant is even stronger here than in *Turner*. There a device that would preclude any chance of accident was readily available at a negligible price. In this case, there is only the testimony of plaintiff's expert that an effective and inexpensive locking device is within the state of the art. Thus the Court finds the inference flowing from defendant's compliance with industry standards more persuasive than plaintiff's untested hypothesis of leverage. An unexpected dumping was not reasonably foreseeable. Under the rule in *Defore*, then, defendant is not liable for plaintiff's injury.

These findings also dictate a conclusion that there was no negligence in the failure to warn that the M–817 might kick up during loading. If the design of the truck was reasonably safe, then there was nothing about which to warn, unless defendant had notice of a particular danger. Plaintiff offered no evidence that this particular danger had been manifested before and had been reported. As the Ninth Circuit held in a similar case, "the jury could well conclude that the appellee's officers were not negligent in not warning their customers against operating the fork lift trucks without the booms, when they themselves had not heard of any accidents that had occurred as a result of such boomless operation." *Persons v. Gerlinger Carrier Co.*, 227 F.2d 337 (9th Cir. 1955).

The Court need not decide whether the Alabama "Extended Manufacturer's Liability Doctrine" is a form of strict liability, in which case recovery may not be had against the United States under the Federal Tort Claims Act. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Even if the doctrine is grounded in negligence, plaintiff has failed to sustain his burden of proving that the M–817 is "defective"—that it is not safe when put to its intended use in the customary manner.

## III. CONTRIBUTORY NEGLIGENCE

There are three elements to contributory negligence in Alabama: (1) that the plaintiff had knowledge of the defective condition, (2) that he appreciated the danger, and (3) that he failed to exercise reasonable care to protect himself from the danger. *Faircloth v. Lamb-Grays Harbor Co., Inc.*, 467 F.2d 685 (5th Cir. 1972); *Alabama Power Co. v. Mosley*, 294 Ala. 394, 318 So.2d 260 (1975). Even if the United States negligently designed the M–817, Medley was contributorily negligent in standing on the cab protector. While plaintiff points to evidence that other drivers stood on the cab, no one denied that it was potentially dangerous to do so. It was dangerous because plaintiff might have slipped and fallen, because the jar from loading might have bounced him off the cab protector, or because the crane might have struck him. Assuming arguendo that plaintiff could not have foreseen the precise cause of his accident, he reasonably could have foreseen, and almost surely did foresee, the nature of his accident. He knowingly exposed himself to the risk that he would be knocked from the cab protector, with the consequent foreseeable risk that he would be pinned under a stump or the truck itself. That he was crushed under the cab protector instead does not alter the critical fact that, with such knowledge as he had, a reasonable man would not have climbed atop the truck. For that reason, the first element of contributory negligence is present.

Plaintiff argues that this case is analogous to those involving breach of warranty allegations. In *Bahlman v. Hudson Motor Car Co.*, 290 Mich. 683, 288 N.W. 309 (1939), and its progeny, the courts held that if the plaintiff's negligent act creates a situation where reliance on a warranty is necessary,

that negligent act cannot relieve the defendant of liability. In *Bahlman* itself, the court held that plaintiff's reckless driving was no defense to the allegation that the car's roof was defective for crushing when the car turned over. There is a logic to these cases, however, that cannot be transferred to this case. The rule in breach of warranty cases is that "contributory negligence is not a defense to breach of warranty where it serves simply to put the warranty to the test." *Brown v. Chapman*, 304 F.2d 149, 153 (9th Cir. 1962). There was no warranty here; the only thing tested by Medley was his luck.

The Court will not assume, however, that plaintiff could not have foreseen the cause of his accident. If an unexpected dump should have been foreseeable to defendant, it should have been equally foreseeable to dump truck drivers like plaintiff, perhaps even more so. Testing after the accident revealed that there was enough play in the hydraulic system to permit the cab protector to rise about two feet off the cab before the piston in the hydraulic cylinder began to move. This suggests that when heavy loads were dropped into the dump truck, the bed and the cab protector may often have "bounced" a bit. This "bounce" would have been apparent to any driver standing on the cab protector and would have given a prudent man notice that a particularly heavy load, if dropped, might cause the bed to "bounce" even more than two feet. Plaintiff thus had had a practical demonstration of the leverage characteristics of the M–817. If the potential for "bounce" reflected a defect in design, then plaintiff was aware of it and must bear the harsh legal consequences.

There can be no question in this case that if Medley recognized the possibility of being bounced off the cab he appreciated the danger. The second element of contributory negligence does not necessarily accompany the first. But in standing on the cab protector, Medley was like a window-cleaner who, if he knows the ropes supporting his scaffold are frayed, cannot help but appreciate his peril. That he nevertheless stationed himself on the cab protector rather than to the side of the truck proves the third element of contributory negligence—that Medley failed to exercise reasonable care. The principle is well-recognized "that if a safe and a dangerous way are equally open, it is the duty of the party to select the safe rather than the dangerous one." *Railway Express Co. v. Real*, 253 Ala. 489, 494, 45 So.2d 306, 310 (1950). Medley could not have chosen a more dangerous place to stand. This is not a situation where the rule applies that "[w]hen a workman . . . proceeds from a place where it is necessary for him to be to another place where it is necessary for him to go, the law will not proclaim him guilty of contributory negligence if he moves over a route unknown to him . . . to be dangerous." *Cooper v. Heintz Mfg. Co.*, 385 Pa. 296, 122 A.2d 699 (1956), *cited in, Hamilton v. United States*, 143 F.Supp. 179 (W.D. Pa.1956). It was not necessary for Medley to stand on the cab protector, as evidenced by the fact that not all the drivers did.

Nor can it be said here that Medley's position only afforded an opportunity or occasion for the injury. To defeat recovery, a plaintiff's negligence must be an "efficient" cause of his injury and not simply a condition of its occurrence. 57 Am. Jur.2d *Negligence* § 381. Had Medley's injury been different in nature or causation from what was reasonably foreseeable, then his standing on the cab protector would have been a mere condition and not a proximate cause of his accident. Even if Medley could only have foreseen that the dump bed would bounce and not rise completely, the difference in causation between those two circumstances is not a difference in kind. Medley is like the man who drives his car knowing that it is leaking brake fluid, that the level is dangerously low, and that brake failure is foreseeable. As it happens, however, the brakes fail when the driver applies them, not because the level of brake fluid is low but because the pedal falls off. While this hypothetical driver did not anticipate the precise cause of his accident, he knew to expect brake failure, the consequences of which were plain. Likewise, while Medley

did not necessarily anticipate that the dump bed would kick up, he knew to expect that a jolt in loading might bounce him off the cab protector. Therefore, his negligence was a proximate cause of the accident and, under Alabama law, bars any recovery. *Allman v. Beam*, 272 Ala. 110, 130 So.2d 194 (1961).

An order will be entered accordingly.