UNITED STATES of America, Appellant,

v.

Thomas O. HUNSUCKER and Eva Newman Hunsucker, Appellees.

No. 17663.

United States Court of Appeals Ninth Circuit.

Dec. 13, 1962.

Joseph D. Guilfoyle, Asst. Atty. Gen., Alan S. Rosenthal and Kathryn H. Baldwin, Attys., Dept. of Justice, Washington, D. C., and Francis C. Whelan, U. S. Atty., Los Angeles, Cal., for appellant.

Durley, Todd, Cearnal & Marshall, Oxnard, Cal., and Irl Davis Brett, Pasadena, Cal., for appellees.

Before BARNES and HAMLIN, Circuit Judges, and SOLOMON, District Judge.

HAMLIN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Southern District of California, awarding Thomas and Eva Hunsucker, appellees, $119,000 for damages to their farm lands lying adjacent to Oxnard Air Force Base, California. The action was brought by appellees under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2671 et seq. Jurisdiction is conferred on this court under the provisions of 28 U.S.C. § 1291.

The district court made the following findings in favor of appellees:

"V. In connection with its operation of said Oxnard Air Force Base, defendant, through its authorized agents, negligently diverted waters from the Las Posas Hills into a channel which was prepared and maintained within said Air Force Base and collected said waters and diverted the same so as to increase their velocity and to discharge the same upon plaintiff's lands, and thereby caused and continued to threaten to cause severe flood damage thereto.

"VI. In connection with the installation and operation of sewage facilities on the said Oxnard Air Force Base, defendant, through its authorized agents, negligently constructed and maintained two (2) oxidation ponds in such manner as to cause sewage effluent to flow under plaintiff's lands and to raise the water table under such lands until it brought salts close to the surface of plaintiff's property, and thereby caused severe damage to crops and to the value of said lands. That such activities were continuous and continuing from 1952 until May 26, 1958."

The court further found that as a direct and proximate result of these acts, appellees' property was damaged in the amount of $119,000. Appellant contends that these findings were clearly erroneous and that in addition the district court erred in failing to hold that appellees' cause of action was precluded by the "discretionary function" exception in the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

The United States maintained an air force base during World War II near Oxnard in Ventura County, California. In 1950 air force officers inspected the base with a view toward its reactivation for use during the Korean conflict. Under date of January 31, 1951, Job No. Oxnard AFB-A51-1A was issued by the Army Chief of Engineers to the Division Engineer in San Francisco authorizing, among other things, extension and strengthening of the runway, construction of taxiway and apron, and design and construction of utilities.

Immediately adjacent to Oxnard Air Force Base was farm land owned by appellees. Through this land and west of the base was a north-south road known as Wood Road. In 1951 the government in connection with its reactivation of the air base acquired by condemnation 130 acres of appellees' land to the west of this road. Appellees retained ownership of 209.25 acres lying west of Wood Road and to the south of the land which had been condemned. The acreage that was retained by appellees has the lowest elevation in the area and is the subject of the instant action.

Prior to reactivation of the air base, a drainage ditch had carried water in a southerly direction along Wood Road. The extension of the runway, however, cut off a portion of Wood Road and its drainage ditch. To take care of flood waters which had flowed down the ditch along that portion of Wood Road that was cut off, the government constructed two 33-inch conduits under the runway to carry the waters southward to a point where they again flowed into the ditch; the conduits were designed to carry the exact capacity which the ditch had formerly carried. In addition, the government constructed a drainage ditch (approximately two miles long) running easterly and westerly along the north side of the base. Near the west end of this ditch, there was a riprap barrier designed to divert water from the ditch into the two 33-inch conduits.

Pursuant to an agreement with Ventura County, flood waters from the Las Posas Hills (northeast of the air base) were diverted into the newly constructed drainage ditch where together with other waters in the ditch they were carried westerly to the riprap barrier. There the waters were partially diverted into the conduits and any waters in excess of the capacity of the conduits

flowed westerly and southerly onto appellees' land. A witness for appellees testified that before this diversion flood waters from the Las Posas Hills had not flowed onto appellees' land. The witness further testified:

A. " * * * When there was more water than there would be carried in these three pipes (indicating), it continued to the western boundary of the air strip and all of it was spilled at one time onto the Wood Ranch.

Q. "On what?

A. "On the Hunsucker property, we call it, at the—around the west end of the flight strip.

Q. "Then it flowed gently on the property?

A. "No. By this time, the water, these other waters were with it, and the water coming from this direction (indicating) is added to what was picked up in the other three places and spilled on in one narrow spot, and it naturally did erosion damage.

Q. "What effects did you observe of that water flowing onto the Hunsucker property?

A. "One year there was so much water it washed the fence out. It carried the fence, the woven wire fence down against the irrigation pots and broke off about six pots. It cut channels, oh, 18, 20 inches or a little deeper through this area (indicating on map), and in addition, I suppose to the natural flood water, we also get the runoff water from the flight strip. * * *"

That the government had knowledge that as a result of the diversion excess waters would flow onto appellees' land was established by the testimony of their own witnesses. Appellees contend that the government also had knowledge that there would be resultant damage to the land and point to the following language of the proposed written agreement between Ventura County and the air force:

"It is understood that all waters in excess of and which cannot be discharged through the existing 33-inch culverts beneath the main runway of the Air Base will be permitted to flow in a Westerly direction and will be discharged off the West property line of the Air Base. The County of Ventura will hold and save the United States of America harmless from any and all liability to persons or corporations because of any and all damage resulting from the discharge of said excess waters off the West property line of the Air Base."

This agreement was not signed by the government and the government denies any knowledge that there would be damage to the land; further, since appellees' land had the lowest elevation in the area the government contends that appellees were always faced with a flooding problem and failed to show that the Base drainage system was the proximate cause of damage to their land. A witness for appellee, however, testified that beets and beans were grown in the area affected by the "runoff" prior to the diversion, but that afterwards it was not possible to do so.

There was a substantial conflict in the testimony and we cannot say that the district court was clearly erroneous in finding that the government negligently diverted flood waters onto appellees' lands and that such negligence was the proximate cause of damage to the land. Accepting the government's statement that appellees' land had the lowest elevation in the area and that consequently appellees had always had a flooding problem, we can only wonder why the government picked this land as the location to dispose of the excess flood waters. Certainly it was not unlikely that allowing large concentrated amounts of water to flow onto such lands would result in some damage. Yet there is no evidence to indicate that the government even considered taking precautions to prevent such damage.

We shall next consider the district court's findings that appellant neg-

ligently constructed and maintained sewage facilities and that such negligence was the proximate cause of damage to appellees' land.

Upon reactivation of the air base a new sewage disposal system was constructed. This system utilized a tank in which waste was separated by gravity and two open ponds into which the remaining fluids flowed for secondary treatment. The ponds were located approximately 100 feet north of appellees' land. They were about nine feet deep and covered a total of 15.86 acres. Effluent was continuously discharged into the ponds (approximately 90,000 gallons a day) until their use was discontinued on May 26, 1958. The ponds were neither sealed nor lined. They were always full and at times would overflow (with the result that some effluent would flow onto appellees' land).

Evidence was introduced to show that it was readily observable at the time the ponds were excavated that the excavation intercepted a sandy layer (acquifer). Appellees' witnesses testified and tests were introduced to show that this sandy layer, underlaid and overlaid by relatively impervious strata, underlay the entire area and that effluent from the ponds percolated into the acquifer and flowed by gravity into and under appellees' land; the effect of this subterranean flow was to raise the water table and cause a concentration of salts in the upper foot, or growing area, of the soil. The increased salinity in the soil inhibited the growth of crops.

Appellees contended that the government was negligent in failing to (1) investigate the effect of underground percolation and flow of the effluent from the ponds; (2) line the ponds with an impervious material; and in (3) allowing such conditions to persist until May, 1958. Appellant admits that no test holes were taken at the pond site for the purpose of determining whether there would be possible percolation of the effluent into and under appellees' land. As to the second ground listed above, an irrigation and drainage engineer who was familiar with the land in the area, testified that he would have lined the ponds. Finally, appellees brought these conditions to the attention of the government in 1953, shortly after the ponds became operative. The government conducted an investigation at that time, but concluded that although there was some percolation of effluent into and under appellees' land, the land was not being damaged thereby.

Evidence was introduced by appellees to show the condition of the land before and after the ponds became operative. One witness testified that it would take from five to twenty years to remove the increased salinity from the soil. Two valuation experts testified, one stating that the property had been damaged in the sum of $129,000 and the other that the property had been damaged in the sum of $119,000.

█ The testimony of the government's witnesses was in sharp conflict with that outlined above. However, the determination as to which testimony was more credible was one for the trier of fact. There is ample evidence to support the district court's findings of negligence and resultant damage, and we therefore cannot set them aside as being clearly erroneous.

█ The sole question remaining for our consideration is whether the district court erred in holding that appellees' cause of action was not precluded by 28 U.S.C. § 2680(a).

The Federal Tort Claims Act was designed to render the government liable for its torts in "the same manner and to the same extent as a private individual under like circumstances." (28 U.S.C. § 2674). Under 28 U.S.C. § 2680(a), however, claims are not actionable if "based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or

not the discretion involved be abused." [1] Where discretion ends and actionable negligence begins for the purpose of this exception cannot be defined without reference to the factual situations in which the question of applicability of the exception has arisen.

In an early case involving interpretation of the exception, Coates v. United States,[2] the Eighth Circuit Court of Appeals held that the discretionary function exception barred recovery on a complaint based on injuries suffered when the government changed the course of the Missouri River. No negligence in the details of the work was alleged; the only acts and omissions on which the claim was based were those which were necessarily a part of the decision to improve water transportation on the river. The court stated: [3]

" * * * Manifestly the project embodies decisions and the exercise of discretion and discretionary functions of the highest order by both the legislative and executive branches of the government and the formulation, expression and application of governmental policy entirely beyond any power of interference by the judicial branch. * * * "

Subsequent to the Coates case, the Supreme Court considered the scope of the exception in Dalehite v. United States,[4] a test case representing some three hundred separate personal and property claims arising out of the explosion of ammonium nitrate fertilizer. In a 4–3 decision, the Court held that recovery was precluded by the discretionary function exception. It was the opinion of the majority that the government could not be subjected to liability arising from acts of a governmental nature; that the exception not only covered the cabinet-level decision to initiate the fertilizer export program, but also determinations by executives or administrators in establishing plans and specifications pursuant to the program. The Court stated that the "decisions held culpable *were all responsibly made at a planning rather than operational level* and involved considerations more or less important to the practicability of the Government's fertilizer program." [5] [Emphasis supplied.]

Despite indications to the contrary in Dalehite, the Supreme Court in Indian Towing Co. v. United States [6] rejected any distinction between the government's negligence when it acts in a proprietary capacity and its negligence when it acts in a uniquely governmental capacity. In Indian Towing, the government conceded that the acts there involved had occurred on the "operational" level and therefore the discretionary function exception was not directly at issue. The government argued, however, that "the language of § 2674 (and the implications of § 2680) imposing liability 'in the same manner and to the same extent as a private individual under like circumstances * * *' must be read as excluding liability in the performance of activities which private persons do not perform." [7] The Court in rejecting this interpretation, stated that there was "nothing in the Tort Claims Act which shows that Congress intended to draw distinctions so finespun and capricious as to be almost incapable of being held in the mind for adequate for-

1. The following statement appears in H.R. Rep.No.1287, 79th Cong., 1st Sess., pp. 5–6 (1945):

   "This a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, * * *, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, * * *."

2. 181 F.2d 816 (8th Cir., 1950).

3. Id. at 817.

4. 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

5. Id. at 42, 73 S.Ct. at 971, 97 L.Ed. 1427.

6. 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

7. Id. at 64, 76 S.Ct. at 124, 100 L.Ed. 48.

mulation.[8] In referring to the Act, the Court stated:[9]

> "The broad and just purpose which the statute was designed to effect was to compensate the victimes of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws. Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it."

Although portions of Dalehite are no longer authoritative,[10] the distinction referred to in Dalehite between decisions made on the planning level as against decisions made on the operational level has been accepted by several courts.[11] For example, the Third Circuit Court of Appeals recently stated the following in Mahler v. United States:[12]

> "The determination by the Secretary of Commerce to approve the plans and specifications for the Penn-Lincoln project, the decision which initiated the federal govern-

ment's financial participation, was obviously a policy judgment of the type most important to the success of the federal-aid highway program. It is administrative action requiring the conscious weighing of such factors as location and anticipation of future traffic flow. The same must be said of federal guidance during the pre-approval design stage. As such, we think that these decisions fall on the planning side of the planning-operational distinction drawn in the Dalehite case, subsequently adopted and approved in Eastern Airlines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, 76–77, aff'd per curiam sub nom. United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L. Ed. 796 (1955). Thus, in the instant case Section 2680(a) withdraws the government's waiver of immunity, insofar as the complaint is based on the allegedly negligent planning and approval of the highway project by the Secretary of Commerce."

That decisions by the Secretary of Commerce are on the "planning" level would seem to be free from doubt.

This court considered the applicability of the discretionary function exception in United States v. Ure.[13] In that case,

8. Id. at 68, 76 S.Ct. at 126, 100 L.Ed. 48. The dissenters in Dalehite took part in the majority opinion in Indian Towing. In referring to Dalehite the Court on page 69, 76 S.Ct. on pages 126, 127, 100 L.Ed. 48 of the report stated as follows: "The differences between this case and Dalehite need not be labored. The governing factors in Dalehite sufficiently emerge from the opinion in that case."

9. Id. at 68–69, 76 S.Ct. at 126–127, 100 L. Ed. 48.

10. See Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

11. See e. g., American Exch. Bank of Madison, Wis. v. United States, 257 F.2d 938 (7th Cir., 1958); Eastern Airlines v. Union Trust Company, 95 U.S.App.D.

C. 189, 221 F.2d 62 (1955), aff'd per curiam sub nom., United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Cf., United States v. Gregory, 300 F.2d 11 (10th Cir., 1962). The district court in the instant case found that the negligent acts occurred "at the subordinate or operational level and were not at the planning level."

The Supreme Court furnished no criteria as to what is activity at the operational level. From the cases considered, the question would seem to be whether in the light of the facts presented imposition of liability on the government would be consonant with the purposes of the Act.

12. 3rd Cir., 306 F.2d 713.

13. 225 F.2d 709 (9th Cir., 1955).

the claim was based on damages allegedly suffered as a result of the decision of the United States Reclamation Service not to completely line an irrigation canal with concrete. The decision not to line the entire canal was based on the fact that the cost would render the project unfeasible and also on the Service's doubt as to its necessity. The canal was lined in places; no break in the canal, in fact, occurred for eleven years. This court held that there was a failure of proof of negligence and that at any rate the decision of the Reclamation Service fell within the purview of the discretionary function exception.

The cases considered above generally involved claims based on decisions at a high level that were directly and vitally related to a particular governmental program or project and are distinguishable on their facts from the instant case. This case presents a factual situation that is more analogous to that considered by the Seventh Circuit Court of Appeals in American Exchange Bank of Madison, Wis. v. United States.[14] In that case the complaint was based on the failure of the government to install a handrail on the steps leading to the Madison, Wisconsin, post office building. The court stated: [15]

> "Undoubtedly there was an exercise of discretion in deciding whether and where a post office building should be located in Madison, Wisconsin, but whether a handrail should be installed as a safety measure on wide stone steps involves action at the operational level and would seem to involve no more discretion than fixing a sidewalk

on post office grounds that might be in need of repair.

> "In the light of the pronouncements of the Supreme Court, and considering the trend of the courts to construe broadly the waiver of immunity provisions of the Tort Claims Act, we hold that the trial court was in error in holding that whether handrails should be installed was a discretionary function."

Similarly, it is clear that the decision to reactivate Oxnard Air Force Base was made on the "planning" level. The directive authorizing construction on the base, however, was very general in its terms and did not specifically authorize the acts and omissions that form the basis of appellees' complaint. Further, from the evidence presented it does not appear that these acts and omissions were a necessary part of the reactivation.[16] After a careful examination of the record, we feel that on the basis of the evidence presented in this case it would not be consonant with the purposes of the Tort Claims Act to conclude that the government was immunized from all liability for its failure to take reasonable precautions to prevent damage to appellees' land. We hold that the district court was not clearly erroneous in finding that appellant's negligence occurred on the operational level and did not err, as a matter of law, in holding that appellees' cause of action was not precluded by 28 U.S.C. § 2680(a).

The district court did err in awarding prejudgment interest,[17] and therefore the case is remanded for correction of the judgment in this respect. In all other respects the judgment is affirmed.

14. 257 F.2d 938 (7th Cir., 1958).

15. Id. at 941.

16. The flood waters from the Las Posas Hills were diverted onto appellees' land pursuant to a proposed written agreement with Ventura County; although the waters were in fact diverted, the agreement was never signed by appellant's representatives. There is no evidence in the record which would indicate that the government even considered the possibility of lining the ponds.

17. It is specifically provided in 28 U.S.C. § 2674 that under the Act the government "shall not be liable for interest prior to judgment."