**ALABAMA ELECTRIC COOPERATIVE, INC.,**
**Plaintiff-Appellant,**

v.

**The UNITED STATES of America and the United States Army Corps of Engineers, Defendants-Appellees.**

**No. 84–7690.**

United States Court of Appeals, Eleventh Circuit.

Sept. 3, 1985.

---

James J. Thompson, Jr., Hare, Wynn, Newell & Newton, Francis H. Hare, Jr., Birmingham, Ala., George C. Douglas, Jr., Andalusia, Ala., George C. Douglas, Jr., Clower, Watkins & Douglas, Troy, Ala., for plaintiff-appellant.

John C. Bell, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., John T. Stahr, David C. Shilton, Dept. of Justice, Land and Natural Resources Div., Appellate Section, Washington, D.C., for defendants-appellees.

Before FAY and ANDERSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Alabama Electric Cooperative, Inc. ("AEC") appeals from a decision of the district court dismissing AEC's complaint on the ground that the acts of design and construction complained of were discretionary functions exempted from liability under the Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. § 2680(a) (West 1965). AEC contends that the district court erred in dismissing its complaint under the discretionary function exception to the FTCA. We agree and reverse.

## I.  FACTS

AEC is an electric cooperative which supplies wholesale or bulk electricity to a num-

* Honorable Floyd R. Gibson, U.S. Circuit Judge, for the Eighth Circuit, sitting by designation.

ber of rural electric cooperatives in central and south Alabama and northwest Florida. In 1967, AEC built a transmission line across the Alabama River. To support the line, a steel tower was constructed on each bank of the Alabama River. When initially constructed, the tower on the east bank was located approximately 75 feet back from the east river bank. At the time, there was no significant river bank erosion occurring in the area. Subsequently, some erosion on the east bank began to occur. This initial erosion was allegedly caused by the Corps of Engineers ("Corps") dumping dredge spoil into the river during 1969–70 and tailwater surges from the Corps' operation of Claiborne Lock and Dam upstream.

During 1970 and 1971, the Corps prepared plans and specifications for a series of eleven dikes or jetties along the Alabama River, the purpose of which was to reduce dredging costs by narrowing the channel and accelerating the current, which would theoretically wash away more silt. One of these dikes was located about one-half mile upstream from AEC's tower, extending out from the opposite bank. The alleged effect of this dike was to deflect the current toward the east bank and AEC's tower. Erosion increased substantially and in August of 1981, AEC determined that its tower was in danger of being undermined. Accordingly, AEC stabilized the tower by driving pilings around its base at a cost of $576,114.09. AEC subsequently brought this action under the FTCA to recover for the cost of stabilizing the tower.

During discovery, the Corps acknowledged that it did not intend to affect the banks of the river by using these dikes, and there was no intentional decision to widen the river at the dike location involved in this suit. The Corps also produced a technical report during discovery called "State of Knowledge of Channel Stabilization in Major Alluvial Rivers." The Corps published the report in 1969, prior to the design and construction of the dikes at issue in the instant case. Although the Corps acknowledged that the report was a recognized authority on dike design, the Corps engineer who was responsible for most of the dike design in the instant case did not recall consulting this publication. The Corps notes, however, that its engineers are not required by regulation to consider this technical report, and AEC has not alleged the violation of any specific regulation. Nonetheless, the report does purport to determine basic principles and design criteria of dikes and other river works. The factors noted in the report as relevant in the design and construction of dikes include: the necessity of bank protection to preserve property; the necessity that all engineering factors and variables which affect river channel geometry be considered and understood; the necessity that bank shear strength be known with respect to flow depth; the requirement that the river engineer determine the effects of a design in advance as accurately as possible; the advisability of constructing a physical model of the river; the requirements that the radius of river bends be analyzed, that maximum depth be plotted against radius of curvature, and that the width selected be tested by computing river current velocities; and, the warning that overcontraction or extending the dikes too far into the river should be avoided or the river will erode the opposite bank.

In contrast to the principles articulated in the report, the Corps engineers involved in the design of the dike at issue in the instant case testified that: the river was not physically modeled; no bend radius was established for the dikes, nor were any design computations made as to proper length and size; no attempt was made to predict the effects of the dikes on the banks; no attempt was made to determine bank slope, bank shear strength, or width-to-depth ratio at which a stable channel could be maintained; and, no attempt was made to determine whether the degree of contraction the dikes would produce would be within levels that the river banks could

tolerate. Instead, Corps officials testified that the design was basically "eyeballed" using "rules of thumb."

## II. THE DISCRETIONARY FUNCTION EXCEPTION AND THE CONTINUED VALIDITY OF THE PLANNING/OPERATIONAL DISTINCTION

■ When it enacted the FTCA, Congress preserved the government's sovereign immunity for:

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C.A. § 2680(a) (West 1965).

The Supreme Court addressed the scope of the discretionary function exception to the FTCA in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). *Dalehite* was a test case involving 300 separate personal and property claims stemming from the explosions of fertilizer with an ammonium nitrate base at Texas City, Texas. In *Dalehite*, the plaintiff argued that the government acted negligently in drafting and adopting its fertilizer export plan; that numerous phases of the manufacturing process were negligently performed; and that the government negligently failed to police the shipboard loading of the fertilizer. In holding that all challenged aspects of the government's fertilizer export program were immune from liability under the discretionary function exception to the FTCA, the Court stated:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty"

that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 968. Cases decided subsequently to *Dalehite* have placed particular emphasis upon the Court's statement that "[w]here there is room for policy judgment and decision, there is discretion." *See, e.g., Griffin v. United States*, 500 F.2d 1059, 1064 (3d Cir.1974).

The most recent pronouncement by the Supreme Court on the scope of the discretionary function exception is contained in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (hereinafter cited as "*Varig Airlines*"). In *Varig Airlines*, the Court rejected "the supposition that Dalehite no longer represents a valid interpretation of the discretionary function exception." 467 U.S. at ——, 104 S.Ct. at 2764, 81 L.Ed.2d at 673. Plaintiffs in *Varig Airlines* sought to recover under the FTCA for the alleged negligence of the Federal Aviation Administration ("FAA") in its aircraft certification process. The plaintiffs' essential argument in *Varig Airlines* was "that the negligent failure of the FAA to inspect certain aspects of aircraft type design in the process of certification gives rise to a cause of action against the United States under the Act." 467 U.S. at ——, 104 S.Ct. at 2766, 81 L.Ed.2d at 675. In holding that the acts of the FAA were immune under the discretionary function exception to the FTCA, the Court noted that the manufacturer of an airplane has primary responsibility for developing plans and specifications and performing the necessary inspections and

tests to insure that an aircraft's design comports with applicable regulations. The Court placed primary emphasis upon the fact that the FAA made a policy decision as to the best means of assuring compliance with its regulations. The Court stated:

> The FAA's implementation of a mechanism for compliance review is plainly discretionary activity of the "nature and quality" protected by § 2680(a). When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding. Here, the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

467 U.S. at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678. In *Varig Airlines,* the Court identified several factors which are particularly important in determining whether acts of a government employee are immune from liability under the discretionary function exception. The Court stated:

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. ... Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.
>
> Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.... This emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."

467 U.S. at ——–——, 104 S.Ct. at 2765, 81 L.Ed.2d at 674–75 (footnote omitted).

At least one court has read *Varig Airlines* as "reject[ing] the planning level/operational level line of cases adopted by various courts." *See Johnston v. United States,* 597 F.Supp. 374, 434 (D.Kan.1984) (dicta). We disagree. In our opinion, *Varig Airlines* supports the planning/operational distinction developed by the lower courts in cases subsequent to *Dalehite.* The *Johnston* court simply failed to appreciate the significance of the planning/operational distinction when it read *Varig Airlines* as rejecting that distinction.[1] The touchstone of the planning/operational distinction is whether the challenged behavior

---

1. The planning/operational distinction does not purport to be a "test" by which the government's

acts are to be measured; instead, the planning/operational distinction amounts to little

involved important policy considerations. In *Estate of Callas v. United States*, 682 F.2d 613 (7th Cir.1982), the Seventh Circuit noted that it had "recently observed that the applicability of the exception ultimately rests upon the characterization of the challenged behavior as involving either 'policy,' on the one hand, or 'operations,' on the other hand, elaborating on a distinction between planning and operational decisions first suggested by the Supreme Court in *Dalehite v. U.S.*" 682 F.2d at 620.

In *Swanson v. United States*, 229 F.Supp. 217 (N.D.Cal.1964), the court explained the significance of the planning/operational distinction as follows:

> In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion. *The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy.* [Decisions] ... are on the planning level because of the necessity to evaluate policy factors when making those decisions.
>
> The operations level decision, on the other hand, involves decisions relating to the normal day-by-day operations of the government. *Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors.*

*Swanson v. United States*, 229 F.Supp. 217, 219–20 (N.D.Cal.1964) (emphasis added and citations omitted). Thus, *Varig Airlines* actually supports the planning/operational distinction when that distinction is properly understood.

## III. DESIGN AS A DISCRETIONARY FUNCTION

### A. *"The Nature of the Conduct"*

In the instant case, the government argues that "decisions as to project design are an inherent and crucial discretionary part of the overall decision to undertake navigation and flood control projects, and fall squarely within the discretionary function exception." The government has not identified a particular aspect of the design process and argued that that aspect of the design was discretionary and thus immune. Instead, the government's position in this case is that *all* design decisions are inherently discretionary and thus immune under the discretionary function exception to the FTCA.

Under *Varig Airlines*, we must first examine the nature of the conduct in determining the applicability of the discretionary

---

more than a conclusion for a result. In *Smith v. United States*, 375 F.2d 243, 246 (5th Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967), this court's predecessor noted that the planning/operational distinction was of little or no use in *answering* the question whether a given decision was immune under § 2680(a). According to the court, "[i]t must be remembered that the question at hand here is the nature and quality of the discretion involved in the acts complained of." *Id.* The *Smith* court, however, rejected the view that "any federal official vested with decision-making power is thereby invested with sufficient discretion for the government to withstand suit when those decisions go awry." The court reasoned that "[m]ost conscious acts of any person whether he works for the government or not, involve choice. Unless government officials ... make their choices by flipping coins, their acts involve discretion in making decisions." *Id.* Thus, the court concluded that if the FTCA was to cover

"anything more than automobile accidents in which government officials were driving," the view that *any* decision involving discretion was immune under the exception had to be rejected.

The *Smith* court went on to note that the Attorney General's decision not to prosecute a case involved choices which affected the *political* interests of the nation and was "an important aspect of government *policy*." *Id.* at 248 (emphasis added). Accordingly, the court held that the exercise of prosecutorial discretion was immune from judicial scrutiny under § 2680(a).

It is clear, however, that the *Smith* court's criticism of the planning/operational distinction as an analytical tool does not amount to a repudiation of the doctrine the distinction has come to stand for. *See, e.g., Payne v. United States*, 730 F.2d 1434, 1437 (11th Cir.1984) (distinguishing cases subsequent to *Smith* as involving negligence at the operational level).

function exception. In examining the conduct alleged to be immune under the discretionary function exception, courts have noted that "if a government official in performing his statutory duties must act without reliance upon a *fixed or readily ascertainable standard*, the decision he makes is discretionary and within the discretionary function exception. Conversely, if there is a standard by which his action is measured, it is not within the exception." *Miller v. United States*, 710 F.2d 656, 663 (10th Cir.1983) (emphasis in original) (quoting *Barton v. United States*, 609 F.2d 977, 979 (10th Cir.1979)).

In *Griffin v. United States*, 500 F.2d 1059 (3d Cir.1974), the plaintiff brought an action against the federal government's Division of Biologic Standards ("DBS") and alleged that DBS acted negligently in its decision to release a production lot of oral live virus polio vaccine. The government responded by arguing that its approval of the vaccine was discretionary and immune under the discretionary function exception. In rejecting the government's claim, the Third Circuit distinguished the professional discretion involved in approving the vaccine from the discretion involved in the formulation of government policy.[2] According to the court, only the latter was insulated from judicial review under the discretionary function exception. The court stated:

> We acknowledge that under DBS' construction of the regulation, the implementation called for a judgmental determination as to the degree to which each of the enumerated criteria indicated neurovirulence in monkeys. The judgment, however, was that of a professional measuring neurovirulence. It was not that of a policy-maker promulgating regula-

2. In *General Public Utilities Corp. v. United States*, 745 F.2d 239, 246 (3d Cir.1984), the Third Circuit noted that its *Griffin* opinion "must be read cautiously because in *Varig* the discretionary exception covered an agency decision that rested on highly technical information." The court, however, declined to determine the continued vitality of *Griffin* but simply noted that "pre-*Varig* cases on the discretionary function must be re-evaluated." *Id.* at 246 n. 8. While we agree that *Varig Airlines* does require a re-evaluation of the lower court decisions decided before it, we think that *Griffin* is consistent with the *Varig Airlines* decision.

*Varig Airlines* requires that we first examine the nature of the conduct; that is precisely what *Griffin* attempted to do. *See Griffin, supra,* at 1066 ("Where the *conduct* of Government employees . . . requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the *conduct* is immunized from judicial review") (emphasis added). Moreover, we do not read *Griffin* as holding that all professional and scientific decisions are outside the discretionary function exception. Instead, the fact that the decision is one involving professional discretion is less important than the question of whether or not the professional discretion involves policy considerations.

Finally, we do not view the discretionary decision in *Varig Airlines* as resting on highly technical information. While it is true that the FAA's inspection of aircraft does rest on highly technical information, the actual inspection of the aircraft was not the conduct found discretionary in *Varig Airlines.* In fact, the Court specifically noted that there was no indication that either of the aircraft at issue in *Varig Airlines* had actually been inspected by the FAA. 467 U.S. at ——, 104 S.Ct. at 2765, 81 L.Ed.2d at 675. Instead, the Court in *Varig Airlines* viewed plaintiffs' claims as challenging "two aspects of the certification procedure: the FAA's decision to implement the 'spot-check' system of compliance review, and the application of that 'spot-check' system to the particular aircraft involved in these cases." *Id.* at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678. The Court emphasized the fact that the decision to implement the "spot-check" system was a policy decision that required the agency to balance "the objectives sought to be obtained against such practical considerations as staffing and funding." *Id.* at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678. Having concluded that the decision to implement the "spot-check" system was a discretionary decision covered by § 2680(a), the Court noted that it followed that the application of that system also fell within § 2680(a). Even so, the Court pointed out that in the application of the system, the actual inspecting employees "were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." *Id.* at ——, 104 S.Ct. at 2768, 81 L.Ed.2d at 678. Thus, the decisions held discretionary in *Varig Airlines* were those that rested on policy judgments and a balancing of practical considerations rather than scientific or technical information.

tions by balancing competing policy considerations in determining the public interest. Neither was it a policy planning decision nor a determination of the feasibility or practicability of a government program. At issue was a scientific, but not policy-making, determination as to whether each of the criteria listed in the regulation was met and the extent to which each such factor accurately indicated neurovirulence. DBS' responsibility was limited to merely executing the policy judgments of the Surgeon General. It had no authority to formulate new policy in the immunization program.

Where the conduct of Government employees in implementing agency regulations requires only performance of scientific evaluation and not the formulation of policy, we do not believe that the conduct is immunized from judicial review as a "discretionary function."

500 F.2d at 1066.

Similarly, in *Hendry v. United States*, 418 F.2d 774 (2d Cir.1969), the plaintiff alleged that a psychiatrist and psychologist of the U.S. Public Health Service acted negligently in diagnosing him as a paranoid schizophrenic and thus unfit for sea duty. The government argued that the decisions were immune under § 2680(a). The Second Circuit also distinguished the discretion insulated from review under the discretionary function exception from the exercise of professional medical discretion. The court stated:

> [C]omplaints attacking discretionary decisions may frequently raise questions which are political and nonjusticiable in nature, but here the judgments arrived at by the doctors are not different in kind or complexity from those which courts are accustomed to entertain when tort suits are brought against private physicians. The fact that judgments of government officials occur in areas requiring professional expert evaluation does not necessarily remove those judgments from the examination of courts by

classifying them as discretionary functions under the Act. To the extent that the medical profession establishes no set rules to accommodate the handling of a particular medical case, the individual doctor's judgment in that case should be measured by the standards of due care.

418 F.2d at 783. In a bit of well-reasoned dicta that might well be applicable to this case, Judge Waterman stated:

> [S]tate tort standards cannot adequately control those governmental decisions in which, to be effective, the decision-maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness. Of course the courts may inquire into whether an engineer's judgment in applying the rules of his craft was reasonable, but if the engineer is a governmental official who must, apart from questions of engineering efficiency and safety, determine whether a particular program of production is a desirable program, the courts cannot doubt the reasonableness of his evaluation of the public interest.

*Id.* As noted above, the Corps does not contend that it made a determination of "whether a particular program ... is a desirable program" or that an evaluation of the public interest was necessary in designing the dikes. *See id.* Instead, the Corps contends that virtually all design decisions are discretionary and thus immune under § 2680(a).

The Corps places great reliance on the statement in *Dalehite* that the discretionary function exception "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 968. In our opinion, this reliance is misplaced. Judge Johnson adequately answered the government's argument in this regard in *Medley v. United States*, 480 F.Supp. 1005, 1008 (M.D.Ala.1979), where he noted that "to read 'plans, specifications or schedules of

operations' as expansively as does defendant is to all but erase the distinction between planning and operational choices." *See also infra* note 8. *But see Irzyk v. United States,* 412 F.2d 749, 751 (10th Cir. 1969) (dicta) (government's preparation of specifications concerning compaction requirements for soil in drainage ditch is discretionary).

Indeed, the primary flaw in the Corps' argument is that it seeks to blindly apply the terms "plans, specifications or schedules of operations" without reference to the underlying rationale of the discretionary function exception. In *Dalehite,* the Court was speaking of the actions of *executives* or *administrators* in establishing "plans, specifications or schedules of operations." *Dalehite, supra* 346 U.S. at 35–36, 73 S.Ct. at 968.[3] To apply this language to an engineer without reference to the underlying rationale of the discretionary function exception is to take the passage out of its intended context. The point is that the discretionary function exception affords the government the right to make its *policy* decisions free from the fear of judicial second-guessing. *Varig Airlines, supra,* 467 U.S. at ——, 104 S.Ct. at 2765, 81 L.Ed.2d at 674.

Thus, when one examines "the nature of the conduct," it is clear that there is nothing to suggest that all *design* decisions are inherently "grounded in social, economic, and political policy." *Id.* at ——, 104 S.Ct. at 2765, 81 L.Ed.2d at 674.

**B.** *Case Law Concerning Design Decisions*

We turn next to an examination of those cases discussing negligent design and the discretionary function exception. Our review of the relevant case authority reveals that social, economic, and political policy may significantly influence a design decision and thus insulate that decision from judicial scrutiny under the discretionary function exception. The cases make it clear, however, that in the absence of such a policy decision, the Corps' engineers must be held to the same professional standards of reasonableness and due care that a private engineer faces when he plies his trade.

1. Cases Finding Design Decisions Nondiscretionary

We first examine those cases holding design decisions to be outside the scope of § 2680(a). In *Seaboard Coast Line Railroad Co. v. United States,* 473 F.2d 714 (5th Cir.1973),[4] plaintiff alleged that the government's negligent design of a drainage system diverted water and thereby undermined its railroad right-of-way. In rejecting the government's argument that the discretionary function exception insulated it from liability for negligent design, the court noted that the government made a policy decision when it made the initial decision to build the drainage system. "Once the government decided to build a drainage ditch, it was no longer exercising a discretionary policy-making function and it was required to perform the operational function of building the drainage ditch in a non-negligent manner." 473 F.2d at 716.[5]

In *Moyer v. Martin Marietta Corp.,* 481 F.2d 585, 598 (5th Cir.1973), plaintiff brought a wrongful death action against the United States for the negligent design and construction of an aircraft ejection seat

---

**3.** We do not suggest that the status of an employee, *i.e.,* his or her rank in the bureaucratic hierarchy, is a relevant consideration in assessing the applicability of the discretionary function exception. The Supreme Court has specifically rejected that argument. *Varig Airlines, supra,* at —— ——, 104 S.Ct. at 2765–66, 81 L.Ed.2d at 674–75.

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the

close of business on September 30, 1981. *Id.* at 1209.

**5.** To the extent that *Seaboard* suggests that the only discretionary decision was the initial decision to build the drainage system, it would have to be re-evaluated in light of *Varig.* As our decision makes clear, the question is whether the subsequent design and construction decisions involved important policy considerations.

which caused the death of her husband. Although the court noted that the case was "very close to the line separating actions covered by the FTCA and those beyond its reach," it nonetheless held that the discretionary function exception did not insulate the government from liability for the negligent design of the ejection seat. 481 F.2d at 598.

The Seventh Circuit's decision in *American Exchange Bank of Madison, Wisconsin v. United States*, 257 F.2d 938 (7th Cir.1958), can also be viewed as a negligent design case. There, plaintiff sued to recover for personal injuries she sustained when she fell on steps leading to an entrance of the post office in Madison, Wisconsin. Plaintiff's theory was that the government was liable for its failure to erect a handrail on the steps leading to the post office entrance. The government argued that the decision of whether to install a handrail was a discretionary decision and immune under § 2680(a). The Seventh Circuit rejected the government's argument and noted that "whether a handrail should be installed as a safety measure on wide stone steps involves action at the operational level and would seem to involve no more discretion than fixing a sidewalk on post office grounds that might be in need of repair." 257 F.2d at 941.

In *United States v. Hunsucker*, 314 F.2d 98 (9th Cir.1962), the Air Force decided to reactivate a World War II air force base for use during the Korean conflict. In connection with the reactivation of the air force base, the government decided to modify the runway and construct a drainage ditch. Plaintiffs were injured when the government negligently diverted flood waters onto plaintiffs' land in connection with the construction. The Ninth Circuit held that the decision to reactivate the air force base was made at the planning level and was therefore covered by the discretionary function exception. The court also held, however, that the particulars of the construction on the base and the negligence

that occurred in connection therewith were performed at the operational level and outside the confines of the discretionary function exception. In finding nondiscretionary operational activity, the court stated:

> Accepting the government's statement that appellees' land had the lowest elevation in the area and that consequently appellees had always had a flooding problem, we can only wonder why the government picked this land as the location to dispose of the excess flood waters. Certainly it was not unlikely that allowing large concentrated amounts of water to flow onto such lands would result in some damage. Yet there is no evidence to indicate that the government even considered taking precautions to prevent such damage.

314 F.2d at 101. Thus, *Hunsucker* can also be considered a negligent design case in that the above-quoted passage strongly implies that a prudent engineer would have "considered taking precautions to prevent such damage."

In *Driscoll v. United States*, 525 F.2d 136 (9th Cir.1975), plaintiff, a civilian employee working on an air force base, alleged that the government's negligent failure to install warning devices, barriers, speed control devices, or crosswalks caused him to be struck by a car while walking to the building in which he worked. The government argued that the decision not to install such traffic safety devices was a planning level decision covered by the discretionary function exception. The *Driscoll* court rejected the government's claims and held that the record before it supported a conclusion that the decision was made at the operational level. The court specifically noted that its holding was "strongly influenced by our belief that the judicial process is demonstrably capable of evaluating the reasonableness of the failure of the Base Civil Engineer to take the steps that Driscoll alleges were necessary," 525 F.2d at 138, *i.e.*, that the engineer had a duty to report unsafe conditions.

In *United States v. DeCamp*, 478 F.2d 1188 (9th Cir.), *cert. denied*, 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (1973), the government argued that the Corps' decision not to require the successful bidder on a government project to equip its bulldozers with safety canopies was covered by the discretionary function exception. In the course of its opinion, the court stated:

[W]e also note that the decision ... [not to require a canopy] was not predicated upon considerations of public policy but upon general standards of safety. Accordingly, state tort law can capably measure the reasonableness of the engineer's judgment in applying professional standards of safety. It is apparent, finally, that the merits of this case are not laden with political questions or other elements suggesting nonjusticiability. In fact, the type of decision assailed is frequently subjected to judicial scrutiny.

478 F.2d at 1192.

In *Medley v. United States*, 480 F.Supp. 1005 (M.D.Ala.1979), the government argued that its alleged negligence in designing a dump truck was covered by § 2680(a). In holding that the discretionary function exception was not properly applicable, Judge Johnson stated:

Plaintiff does not question the decision made in the late 1940's to build a tactical series of 5-ton trucks that would include a dump truck. That clearly was a policy decision. Rather, plaintiff questions a detail of the dump truck's design. The matter of the truck's leverage and its lack of a safety lock involved no policy considerations at all.

Setting standards of safety is one thing; adherence to those standards is another. The former involves balancing social wisdom against economic expediency; the latter involves objective standards, which permit judicial scrutiny.... [I]f the M–817 dump truck was negligently designed, the fact that federal employees designed it does not immunize the government. The United States offered no evidence that a safety lock was omitted as a result of a conscious policy decision....

... Within the parameters set by military planners, defendant was under a duty to design a safe dump truck. If, as alleged, it failed to do so, that failure reflects a mistake of professional judgment and not an abuse of political discretion.

480 F.Supp. at 1008–09.

In *Jemison v. The Duplex*, 163 F.Supp. 947 (S.D.Ala.1958), the Corps of Engineers contracted with a dredging company to deepen the ship channel of the Mobile River. The contract called for the dredging company to employ a technique called box-cutting which essentially consisted of undercutting the river bank to form the proper side-slope required by the specifications. The contract specifications also called for dredging at a depth of 26 feet at certain wharves on the Mobile River, but the pilings under the wharves extended only to a depth of 20 feet. Thus, when the dredging at the wharves began, the wharves subsided, and the dredging caused considerable damage. In an action to recover the cost of repairing the wharves, the court held that the government "was guilty of negligence in failing to secure adequate information as to the wharves ... while planning the project, and in preparing specifications the carrying out of which was proximate cause of subsidence of the wharves." 163 F.Supp. at 950. The government argued that the dredging operation was a discretionary function under § 2680(a). The court, however, rejected the government's claim and stated:

Discretion within the meaning of the Tort Claims Act was exercised when it was decided that the ship channel in the Mobile River should be deepened. But in drawing the plans and specifications pursuant to achieving this improvement, the United States Engineers were not given *carte blanche* to draft plans and specifications for the dredging operations in

negligent disregard for the rights of property owners along the shore. When acts of negligence are committed at the *operational level*, the government is no longer immune from suit. "Operational negligence" is actionable negligence.

163 F.Supp. at 951 (emphasis in original).[6] Other cases have also held that the discretionary function exception does not insulate the government from liability for negligent design. *See Stanley v. United States*, 347 F.Supp. 1088 (D.Me.1972) (failure to equip radio tower ladder with guardrails), *vacated on other grounds*, 476 F.2d 606 (1st Cir.1973); *Swanson v. United States*, 229 F.Supp. 217 (N.D.Cal.1964) (negligent design and installation of aircraft elevator mechanism); *Foster v. United States*, 183 F.Supp. 524 (D.N.M.1959) (failure to provide guardrails on bridge).

Thus, the cases belie the Corps' contention that the discretion involved in design decisions is the type of discretion that is immune from judicial review under § 2680(a).

2. Cases Finding Design Decisions Discretionary

We turn next to an examination of those cases which do apply the discretionary function exception to immunize the government from liability. The Corps argues that *Payne v. United States*, 730 F.2d 1434 (11th Cir.1984), supports its contention that virtually all design decisions are immune under § 2680(a). In *Payne*, dredging and widening of a bend upstream from plaintiff's home caused the riverbank to erode, and plaintiff's home eventually collapsed into the river. Plaintiff argued that the "negligent redesign" of the Tombigbee River's course caused her damage. Although the Corps in *Payne* knew that erosion of the riverbank would be the likely

result of its actions, the Corps "decided the cost of conducting studies to identify these areas would exceed the cost of any after-the-fact acquisition that might be required." *Id.* at 1435. The court in *Payne* characterized the issue on appeal as "whether ... the Government's decision to not conduct the studies to determine potential damages is a discretionary ... decision so that it is excepted by ... § 2680(a)." *Id.* The court held that the decision of whether to conduct the prospective damage study was "inherent in the policy and planning decision to redesign the waterway and, as such, was a discretionary function of the type exempt from review under the Federal Tort Claims Act." *Id.* at 1437.

*Payne* is, however, clearly distinguishable from the facts of the instant case. First, it may be a misnomer to call *Payne* a negligent design case. Although the plaintiff in *Payne* characterized her claim as one for "negligent redesign," the court specifically noted that there was "no evidence that, if the bend were widened, any change in design or construction would have avoided the later damage to the plaintiff's property." *Id.* at 1435. Thus, it is difficult to view *Payne* as a negligent design case if no change in design would have avoided the harm to plaintiff.

More importantly, the Corps in *Payne* essentially made a cost-benefit analysis of the costs and expected benefits of the prospective damage study. This was clearly the type of policy decision that the discretionary function exception insulates from judicial review. The decision was primarily an *economic* one that involved a comparison of the costs of conducting the study with the costs of after-the-fact acquisition. As noted above, the Corps does not contend that the design decisions in the instant case involved a comparison of such factors;[7]

---

6. As with the *Seaboard* case, *Jemison's* suggestion that the only discretionary decision was the initial decision to dredge the channel must be re-evaluated in light of *Varig*. *See supra* note 5.

7. In the instant case, the district court stated:

AEC's claim is that the Corps should have taken into consideration the expected effect of stone dikes ... on the riverbank at the location of its transmission tower. Of course, if this were the law, the Corps would also have had to take into account the expected effect of

the Corps' argument is that virtually all design decisions are discretionary decisions covered by § 2680(a).

Numerous cases hold that the inspection and approval of highway construction plans constitutes a discretionary function under § 2680(a), but we believe those cases are entirely consistent with our holding in the instant case.[8] *See Miller v. United States,*

the dikes on all riverbank locations downstream from the eleven channel stabilization structures. It is this potential scope of government responsibility that led the Eleventh Circuit to say that "the decision not to conduct extensive studies fell within the discretionary function exception to tort liability." *Payne v. U.S.,* 730 F.2d at 1436.

*Alabama Electric Cooperative, Inc. v. United States,* No. 83–T–567–N, Slip Op. at 8 (M.D.Ala. Sept. 21, 1984) (footnote omitted). The district court, however, apparently overlooked the fact that in *Payne,* the Corps *did consider* the fact that its actions would likely cause erosion and encroachment in some areas. In *Payne,* however, the Corps made a *policy* decision not to determine precisely where the harm would occur, and thus the propriety of that decision is not subject to judicial review. In contrast, the district court may find on remand in this case either that the Corps never considered the possibility that the dikes it planned to construct might adversely affect the opposite river bank, or otherwise made no *policy* decision not to determine the harm to the opposite bank.

**8.** In *Medley v. United States,* 480 F.Supp. 1005, 1009 n. 2 (M.D.Ala.1979), the court noted that the applicability of the discretionary function exception might vary depending upon whether the United States itself designed the product or whether the government simply approved another's design. *Compare Driscoll v. United States,* 525 F.2d 136 (9th Cir.1975) (engineer's failure to install traffic safety devices on air force base held not to be discretionary under § 2680(a)) *with Miller v. United States,* 710 F.2d 656 (10th Cir.1983) (approval of highway construction design with allegedly inadequate safety features held discretionary under § 2680(a)).

Some cases, however, do not fit the pattern noted by Judge Johnson in *Medley.* In *Wright v. United States,* 568 F.2d 153 (10th Cir.1977), *cert. denied,* 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978), plaintiffs brought a wrongful death action against the United States to recover for the death of their parents. Plaintiffs' parents were killed when their car fell into a creek after portions of a bridge and its approach roads were washed out by severe flooding. Although the State of Utah designed the bridge, the Bureau of Indian Affairs designed the approach roads. The district court held that the United States negligently designed and constructed the approach roads and accordingly held the government liable. The Tenth Circuit reversed, holding that the district court's finding of negligence was clearly erroneous, that Utah's subse-

quent acceptance and maintenance of the bridge and approach roads relieved the United States of any liability, and that the actions of the United States constituted a discretionary function under § 2680(a). The court summarized its holding as follows:

We thus hold that the Bureau's decision to aid and assist the State of Utah in constructing the bridge and approach ways in this case comes within the discretionary exemption of the Tort Claims Act. Accordingly, neither its adoption or implementation of "plans, specifications, or schedules of operations" for the project gave rise to a viable cause of action under the Act.

568 F.2d at 159. Judge Holloway registered a strong dissent, deeming the majority's interpretation of the discretionary function exception an "unwarranted expansion of the exception." *Id.* (Holloway, J., dissenting). Judge Holloway found the majority's interpretation of *Dalehite's* reference to "plans, specifications or schedules of operations" to be particularly troubling. He stated:

If the majority's expansive interpretation is made of the exception and the *Dalehite* references to "plans, specifications or schedules of operations," then it is hard to imagine an independent similar act by an engineer or other Government employee which would not be immunized from the possibility of relief under the Act.... In my opinion, this is contrary to the intent of the statute, the *Dalehite* case, and numerous well-reasoned decisions....

Thus, for the exception to apply the acts in question must be steps directed by a planning-level *policy* decision.... Under the *Dalehite* test, it is only those plans which involve such policy considerations that are protected by the exception, ... and the "plans" involved here were not shown to have been of that type in any sense.

568 F.2d at 160 (Holloway, J., dissenting) (citations omitted, emphasis in original). Judge Holloway concluded that "[t]o apply the exception as broadly as the majority opinion does here is to allow the exception to swallow up the Act." 568 F.2d at 161 (Holloway, J., dissenting).

Our rejection of the Corps' argument that the *Dalehite* language concerning "plans, specifications or schedules of operations" insulates most design decisions from judicial review, *see supra* text accompanying note 3, should make it clear that we believe Judge Holloway had the better-reasoned view in *Wright.*

In *Patton v. United States,* 549 F.Supp. 36 (W.D.Mo.1982), the court held that the discre-

710 F.2d 656 (10th Cir.1983); *Daniel v. United States*, 426 F.2d 281 (5th Cir.1970); *Mahler v. United States*, 306 F.2d 713 (3d Cir.), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). In *Miller*, the court held that the statutory directive to evaluate each project in light of the "best overall public interest" rendered the decision a discretionary one under § 2680(a) since it involved "policy and competing considerations." 710 F.2d at 663–65. In *Daniel*, this court's predecessor held that approval of the design of a highway project was immune as a discretionary function "[s]ince the statutory language pertaining to safety is but one of numerous standards which the Secretary must look to in determining whether or not approval is to be given." 426 F.2d at 282. In *Mahler*, the Third Circuit held that highway approval was a discretionary policy judgment that required "the conscious weighing of such factors as location and anticipation of future traffic flow." 306 F.2d at 723.

In *United States v. Ure*, 225 F.2d 709 (9th Cir.1955), plaintiff alleged that government engineers acted negligently in deciding not to line an irrigation canal with concrete. The engineers testified that the feasibility of the entire project would have been in jeopardy had the entire canal been lined with concrete, and that the decision not to line the entire canal was made primarily because of the prohibitive cost. *Id.* at 712–13. The Ninth Circuit held that this decision fell clearly within the discretionary

function exception and accordingly reversed the district court's finding of governmental liability. *Id.* at 713.

In *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871 (10th Cir.1984), plaintiff sought to hold the government liable for negligence in designing the terminal control area ("TCA") surrounding Denver's Stapleton International Airport. A TCA is a series of air traffic control zones designed to segregate aircraft from each other in areas surrounding major airports. The desires of aviators varied with respect to the design of the TCA; those who wished to maximize safety favored a larger TCA, and those who wanted to minimize the inconvenience associated with the TCA favored a smaller TCA or none at all. Thus, in designing the TCA, government officials had to weigh the competing interests of all users. The Tenth Circuit held that the policy decision which emerged from this weighing process was a discretionary decision under § 2680(a). *Id.* at 876.

Thus, most of the cases which find a discretionary function exemption in the design context do so because the decision at issue implicated policy considerations. These cases also support the rationale that we employ in this case.

## IV. CONCLUSION

■ In summary, we hold that where the Corps makes a social, economic or political policy decision concerning the design of a particular project, that decision is excepted

---

tionary function exception was properly applicable where plaintiff alleged that the government had negligently designed a road. The court stated:

> This Court finds the design of this road by the Corps of Engineers was a discretionary function. The Corps could have designed a seventy-miles per hour divided highway with banked curves, but instead exercised its discretion to design a twenty-miles per hour highway through this recreational, playground and camping area and the claim of negligence in this regard is barred by the provisions of § 2680(a).

549 F.Supp. at 38. The reference to the recreational nature of the area in question implies that the Corps had more than safety on its mind when it designed the road in question in *Patton*.

At the least, the reference can be interpreted to mean that the policy considerations concerning the recreational nature of the area dictated the appropriate type of road. The *Patton* court's reliance on *Fireman's Fund American Ins. Co. v. United States*, 482 F.Supp. 893 (D.Ore.1979), bolsters this conclusion. In *Fireman's Fund*, the court held that the Forest Service's design of a road was a discretionary policy decision that involved a consideration of "the location of slide areas, the impact of the proposed road on wildlife and fisheries, the types of users, engineering design requirements, budgetary limitations, and legal restrictions." 482 F.Supp. at 895–96.

from judicial review under § 2680(a). In the absence of such a policy decision, the Corps' design decisions are subject to judicial review under the state law tort standards that would normally govern an action for engineering malpractice.

We reverse because the district court applied an erroneous legal standard. Although the record in the instant case reveals no policy decision made by the Corps concerning the effect of the dikes on the opposite bank, the district court may in its discretion permit the government to open the record in an effort to show that its actions did in fact involve such policy considerations.[9]

Accordingly, the decision of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

**9.** AEC also argues that the district court erred in dismissing its count asserting a cause of action for trespass because the discretionary function exception does not insulate the government from liability for trespass. *See Simons v. United States,* 413 F.2d 531 (5th Cir.1969). The government responds by arguing that this argument was not made in the district court. If the district court reopens the record for the benefit of the government on the main issue, AEC shall also be permitted to make its trespass argument. We decline to address the trespass argument without the benefit of the district court's evaluation of the argument in the first instance.

AEC also argues that this court should enter summary judgment in its favor. We decline to do so because the district court may in its discretion reopen the record on remand, and in any event the district court based its decision on only the discretionary function issue and did not rule on the government's other defenses of the statute of limitations and navigational servitude.